NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

| | | |
|---|---|---|
| | : | |
| PHARMACIA CORPORATION | | |
| (f/k/a Monsanto Company), | : | |
| | | |
| Plaintiff, | : | Civ. No. 04-3724  (GEB) |
| v. | | |
| | : | **MEMORANDUM OPINION** |
| MOTOR CARRIER SERVICES CORP., CSX | | |
| INTERMODAL, INC., CSX CORPORATION, | : | |
| G.O.D., INC., and RILEY LEASING CORP., | | |
| | : | |
| Defendants. | | |

---

**BROWN, Chief Judge**

     This matter comes before the Court upon the Motion for Summary Judgment of

Defendants Motor Carrier Services Corp. ("Motor Carrier"), CSX Intermodal, Inc.

("Intermodal"), and CSX Corporation ("CSX") (collectively "Defendants") against Plaintiff

Pharmacia Corporation ("Pharmacia" or "Plaintiff"), Pharmacia's Motion for Summary

Judgment against Motor Carrier, Pharmacia's Motion for Summary Judgment against Intermodal,

and Pharmacia's Motion for Leave to Further Amend its Complaint.  The Court has decided the

motions without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons

set forth below, the Court will grant Pharmacia's Motion for Leave to Amend, deny Defendants'

Motion for Summary Judgment, deny Pharmacia's Motion for Summary Judgment against Motor

Carrier, and grant in part and deny in part Pharmacia's Motion for Summary Judgment against

Intermodal.

## I.    BACKGROUND

This case arises out of environmental damage incurred on a piece of property abutting the Passaic River in Kearny, New Jersey (the "Kearny Property" or "Kearny Site").  Pharmacia owned the property from 1956 to 1991 and used it for the manufacture of, *inter alia*, phosphoric acid and sodium trioplyphosphate.  Am. Compl. ¶¶ 26-27.[1]  Pharmacia's activities are known to have contributed to the environmental damage to the Kearny Property.

### 1.    Pharmacia's environmental clean-up responsibilities up to 1994.

In July 1989, Pharmacia entered into an Administrative Consent Order ("ACO")with the New Jersey Department of Environmental Protection ("NJDEP"), aimed at cleaning up some of the environmental damage sustained at the Kearny Property.  Pharmacia Motion - Motor Carrier, at 4-5.  Under the ACO, Pharmacia "agreed to perform interim remedial measures, to prepare a remedial investigation and feasability study, and to design and implement a remedial action alternative selected by NJDEP at the Kearny Site."  Pl. R. 56 Statement ¶ 9; Def. R. 56 Counterstatement ¶ 9.  Pharmacia asserts that it performed the remedial investigation and feasibility study required under the ACO. Pl. R. 56.1 Statement ¶ 12.

On August 4, 1993, Pharmacia submitted to the NJDEP a Preliminary Remedial Action Work Plan (the "Work Plan") to govern remedial action at the Kearny Site.  Pl. R. 56.1 Statement ¶ 17, Def. R. 56.1 Counterstatement ¶ 17.  The Work Plan mandated that Pharmacia perform eight basic tasks to allow for the removal of contaminated soils at the Kearny Site: "(1) installation of sheet piping; (2) dewatering; (3) mobilization of equipment; (4) excavation; (5)

---

[1]        Pharmacia was formerly known as Monsanto Company. Am. Compl. ¶ 38.The company now known as Monsanto Company has never owned or operated the Kearny Property.  *Id.* at ¶ 52.  For the sake of clarity, this Opinion will refer to plaintiffs as Pharmacia.

2

backfilling; (6) treatment and disposal of soils and extracted water; (7) capping and monitoring; and (8) final reporting to NJDEP."  Pl. R. 56.1 Statement ¶ 18, Def. R. 56.1 Counterstatement ¶ 18.

On November 11, 1994, Pharmacia submitted a Remedial Action Report to NJDEP (the "Remedial Report"),  Pl. R. 56.1 Statement ¶ 21, Def. R. 56.1 Counterstatement ¶ 21, claiming to have completed soil remediation at the Kearny Site.  In response, the NJDEP issued a "No Further Action" Letter for soils at the Kearny Site on December 13, 1995 ("the "Kearny NFA"). Pharmacia Motion - Motor Carrier, at 10.[2]

### 2.      The Sale of the Kearny Property.

On December 19, 1994, Pharmacia and Motor Carrier entered into an Agreement (the "Agreement") for the sale of the Kearny Property to Motor Carrier.  Pl. R. 56.1 Statement ¶ 27, Def. R. 56.1 Counterstatement ¶ 27.  In turn, in late 1997, an affiliate of CSX inquired about acquiring the Kearny property from Motor Carrier.  Pl. R. 56.1 Statement ¶¶ 73-78; Def. R. 56.1 Counterstatement ¶¶ 73-78.  Instead of purchasing the property outright, however, the affiliate of CSX entered into an agreement in December 1997 with the shareholders of Motor Carrier under which the affiliate purchased all outstanding shares of Motor Carrier.  Pl. R. 56.1 Statement ¶ 84; Def. R. 56.1 Counterstatement ¶ 84.  In January 1998, the CSX affiliate assigned its rights under the stock purchase agreement to Intermodal.  Pl. R. 56.1 Statement ¶ 89; Def. R. 56.1 Counterstatement ¶ 89.

---

[2]      While the NJDEP issued a no further action letter to Pharmacia, it nonetheless requested, "[w]ith regard to benzene . . . that Pharmacia conduct further investigation or establish a Classification Exception Area ("CEA") for benzene in the groundwater."  Pl. R. 56.1 Statement ¶¶ 70-72, Def. R. 56.1 Counterstatement ¶¶ 70-72.  On October 4, 2002, Pharmacia decided to establish a Classification Exception Area for benzene in the groundwater.  Pharmacia Motion - Motor Carrier, at 11-12.  The CEA was approved by the NJDEP. *Id*.

   3.      **Clean-up responsibilities after 1994.**

         a.      **The NJDEP Directive.**

On September 19, 2003, NJDEP issued a directive entitled "Directive No. 1 - Natural Resource Injury Assessment and Interim Compensation Restoration of Natural Resources Injuries" (the "Directive").  Pharmacia Motion - Motor Carrier, at 14.  Pharmacia and Motor Carrier were among the sixty-seven parties targeted by the Directive.  *Id.*

The Directive alleged that the Kearny Site was among the "Hazardous Discharge Sites" that had contaminated the Lower Passaic River.  Pl. R. 56.1 Statement ¶ 125; Def. R. 56.1 Counterstatement ¶ 125.  According to the Directive, the NJDEP "ha[d] determined that hazardous substances were discharged at the [Kearny Site,] that those hazardous substances [we]re emanating and/or ha[d] emanated into the Lower Passaic River, [and] that [Pharmacia] and Motor Carrier [were] persons in any way responsible, pursuant to the Spill Compensation and Control Act, for th[ose] hazardous substances."  Pl. R. 56.1 Statement ¶ 126; Def. R. 56.1 Counterstatement ¶ 126.  The Directive compelled Pharmacia, Motor Carrier and others to "conduct an assessment of natural resources that ha[d] been injured by discharges of hazardous substances at sites in the Lower Passaic River watershed," and threatened them with suit for damages if they "fail[ed] to arrange for the clean up and removal of the discharges in the Lower Passaic watershed by implementing an assessment of natural resource injuries."  Pl. R. 56.1 Statement ¶ 127, Def. R. 56.1 Counterstatement ¶ 127.

b.      **The USEPA investigation**.

On September 15, 2003, Pharmacia received a letter from the United States Environmental Protection Agency ("USEPA") captioned "Diamond Alkali Superfund Site Notice of Potential Liability for Response Actions in the Lower Passaic River, New Jersey."  Pharmacia Motion - Motor Carrier, at 12. The letter informed Pharmacia that USEPA was investigating environmental damage to the Passaic River, and that it had come to the conclusion that Pharmacia's activities on the Kearny Property had contributed to that damage.  Certification of E. McTiernan ("McTiernan Cert."), at Ex. S.  The letter further encouraged Pharmacia to cooperate with USEPA in its effort to remedy the environmental damage to the Passaic River and share in the costs of the procedure.  *Id.*

On March 10, 2004, USEPA issued a Final Draft Administrative Order on Consent in *In re Lower Passaic River Study Area Portion of the Diamond Alkali Superfund Site* (CERCLA Docket No. 02-3004-2001) (the "USEPA Order").  Pharmacia Motion - Motor Carrier, at 12; Certification of J. McGahren ("McGahren Cert."), Ex. 30.  The USEPA Order became effective on June 22, 2004.  Pharmacia Motion - Motor Carrier, at 13.  While Pharmacia was not one of the original Settling Parties, Pharmacia signed Amendment No. 1 on June 29, 2005 to become a settling party.  *Id.*, at 13-14.

4.      **Procedural history**

Seeking contribution from Defendants for its liabilities in connection with the NJDEP and USEPA investigations, Pharmacia filed its first Complaint against Defendants in connection with the Kearny Property on August 5, 2004 , then filed an Amended Complaint on April 11, 2004 (the "Amended Complaint").  On October 6, 2006, Pharmacia filed a Motion for Leave to

Further Amend the Complaint  (the "Motion to Further Amend").  On October 23, 2006

Defendants filed a Motion for Summary Judgment against Pharmacia, while Pharmacia filed a

Motion for Summary Judgment against Intermodal ("Pharmacia Motion - Intermodal"), and a

Motion for Summary Judgment against Motor Carrier ("Pharmacia Motion - Motor Carrier").

## II.     DISCUSSION

### A.     STANDARDS

#### 1.     Summary Judgment.

A party seeking summary judgment must "show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV.

P.  56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prod. Co.*,

789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably

be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)

(noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving

party for a jury to return a verdict in its favor).  In deciding whether triable issues of fact exist,

the court must view the underlying facts and draw all reasonable inferences in favor of the

non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587

(1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*,

811 F.2d 225, 231 (3d Cir. 1987).

#### 2.     Leave to File Amended Complaint.

Federal Rule of Civil Procedure 15(a) provides that:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served, or if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.  A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

FED. R. CIV. P. 15(a).  "Although the Rule states that leave to amend should be "freely given," a district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party."  *Rhymer v. Philip Morris, Inc.*, 164 F. App'x 268, 268-69 (3d Cir. 2006) (quotations omitted).

## B.    APPLICATION

### 1.    Pharmacia's Motion for Leave to Further Amend the Complaint.

Pharmacia argues that it should be granted the right to further amend its Amended Complaint so that it can retract its claim for contribution under § 107(a)(4)(B) of the CERCLA statute, 42 U.S.C. § 9607(a)(4)(B), and replace it with a claim for contribution under section 113(f)(3)(B) of the statute.  This Court will grant Pharmacia leave to so amend its Complaint.

In its initial Complaint, Pharmacia sought contribution from Defendants under section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1).  That section provides, in part, that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 107(a)."  42 U.S.C. § 9613(f)(1).  On December 30, 2004 however, Pharmacia moved to amend

7

its initial Complaint, on the grounds that the Supreme Court's decision in *Cooper Indus., Inc. v. Aviall Serv., Inc.*, 543 U.S. 157 (2004) had established that Section 113(f)(1) of CERCLA did not provide a private party who had not been sued under Section 107(a) with a statutory cause of action for contribution.  First Motion to Amend at 2.

Its motion to amend having been granted by the Court, Pharmacia replaced its Section 113(f)(1) claim for contribution with a claim under Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B).  That section provides that "any covered person" will be "liable for . . . any . . . necessary costs of response incurred by any other person consistent with the national contingency plan."  *Id.*  Pharmacia alleged that the section implied a right of contribution among jointly liable parties.  Am. Compl. ¶¶ 86-96.

On October 6, 2006, Pharmacia moved once again before this Court to amend its operative complaint, arguing that the Third Circuit's decision in *E.I. duPont de Nemours & Co. v. United States*, 460 F.3d 515 (3d Cir. 2006) – refusing to recognize an implied right of contribution under Section 107(a)(4)(B) of CERCLA – forced Pharmacia to abandon its claim for contribution under section 113(f)(1) and bring instead a "nearly-identical contribution claim pursuant to Section 113(f)(3)(B) [of CERCLA, 42 U.S.C. § 9613(f)(3)(B)]." Motion to Further Amend, at 4.  That section provides, in part, that:

> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not a party to [such] a settlement . . .

42 U.S.C. § 9613(f)(3)(B).

In response, Defendants argue that Plaintiff's motion for leave to file a Second Amended Complaint should be denied because allowing Plaintiff to do so now would "unduly delay" proceedings.  In particular, Defendants allege that Plaintiff knew of its right to seek contribution under § 113(f)(3)(B) as of June 29, 2005 (when Plaintiff signed a final settlement agreement with USEPA), and that its failure to put forward that claim until now is nothing more than an improper delaying tactic.  Def. Opp'n Br., at 6.  The Court, however, concludes that the filing of a Second Amended Complaint would not unduly delay this case and would not prejudice Defendants.

"The question of undue delay, as well as the question of bad faith, requires that we focus on the plaintiff's motives for not amending [its] complaint to assert [its] claim earlier."  *Lindquist v. Buckingham Twp.*, 106 F. App'x 768, 775 (3d Cir. 2004), *cert. denied* 543 U.S. 1121 (U.S. Jan. 24, 2005) (No. 04-681), *quoting Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984), *cert. denied* 496 U.S. 1122 (U.S. Jan. 7, 1985) (No. 84-384).  While this Court notes Defendants' argument that Plaintiff could have advanced this new ground for contribution earlier, it does not find the delay to have been motivated by any desire to unduly delay this action.

Indeed, Plaintiff is unlikely to have been motivated by a desire to unduly delay these proceedings, given that it announced its intention to file a claim for contribution under § 113(f)(3)(B) as early as December 30, 2004. Noting then in its motion to amend the Complaint "that it was in the process of settling a portion of its potential CERCLA liability with the EPA," Pharmacia declared that "it intended to further amend its Complaint to add a claim for

contribution under Section 113(f)(3)(B) of CERCLA when the settlement became binding and Pharmacia's Section 113(f)(3)(B) claim was perfected."  Motion to Further Amend, at 2-3.[3]

Defendants also fail to show that they would be unduly prejudiced if the Court were to grant Plaintiff's motion.  As Defendants have been aware since the initial Complaint was filed that Plaintiff intended to put forth a claim for contribution, the particular statutory clause under which Plaintiff planned to do so would have little impact on the type of discovery performed by Defendants to counter the claim.  *Id.*, at 6; *see also Dole v. Arco Chemical Co.*, 921 F.2d 484, 487-88 (3d Cir. 1990) (holding that party's attempt to amend to "refine theory of liability upon which liability might be based" was not reflective of undue delay, particularly since there were "legitimate questions as to which regulations govern[ed] in [that] unique factual situation" and since the "proposed amendment implicate[d] few, if any, new facts.").   This lack of prejudice suffered by Defendants is decisive.  *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (holding that the prejudice suffered by non-moving party "is the touchstone for the denial of an amendment."), *quoting Cornell & Co. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978).

For the foregoing reasons, this Court will grant Pharmacia's request to further amend its complaint under Fed. R. Civ. P. 15(a).

---

3       It is also worth noting that Judge Falk had ordered that any motion to amend the complaint be brought by October 16, 2006.  *See* December 12, 2005 Order.  The underlying motion was filed 10 days before that deadline. Defendants cannot claim to have been blind-sided by Plaintiff's Motion to Further Amend.

      **2.**     **Defendants' Motion for Summary Judgment on the issue of Laches and Equitable Estoppel**.

Defendants move for summary judgment on the grounds that Pharmacia is precluded under the doctrines of equitable estoppel and laches from asserting its contractual claim.  The Court will deny Defendants' motion for the following reasons.

      **a.**     **Equitable Estoppel.**

Under New Jersey state law, a party claiming the benefit of the estoppel must show:

> that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action.  Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment.

*A.P. Dev. Corp. v. Band*, 113 N.J. 485, 496-97 (1988), *quoting Miller v. Miller*, 97 N.J. 154, 163 (1984); *see also O'Malley v. Dept. of Energy*, 109 N.J. 309, 317 (1987) ("The essential elements of equitable estoppel are a knowing and intentional misrepresentation by the party sought to be estopped under circumstances in which the misrepresentation would probably induce reliance, and reliance by the party seeking estoppel to his or her detriment."), *citing Horsemen's Benevolent & Protective Ass'n v. Atlantic City Racing Ass'n*, 98 N.J. 445 (1985).

Defendants contend that Pharmacia is estopped from requesting indemnification under the Agreement for damages incurred as a result of the USEPA and NJDEP investigations, on the grounds that Pharmacia waived its contractual rights when it allegedly (1) "concealed the USEPA's claims for more than eight years;" (2) "affirmatively assured Motor Carrier and Intermodal that there had been no violations of the 1994 Agreement;" (3) "induced Intermodal to acquire the capital stock of Motor Carrier;" (4) "induced Motor Carrier to cause Intermodal to

become an "Affiliate" within the meaning of Article 5 of the 1994 Agreement, and" (5) "sought to have USEPA take direct action against Motor Carrier."  Def. MSJ Br. at 10-11.

In particular, Defendants argue that Pharmacia had been aware of USEPA's claims against them since April 26, 1996 at the latest, when "USEPA notified Pharmacia of its potential liability for response actions in the Passaic River." Def. MSJ Br., at 11.[4]  Defendants claim that they were not notified of USEPA's inquiries at the time they were made, that Pharmacia failed to disclose the USEPA investigation even when Intermodal acquired Motor Carrier, and that not once in the regular correspondence between Pharmacia and Motor Carrier regarding environmental issues was the topic of USEPA's investigation of the impact of activities at the Kearny Site may have had on the Passaic River addressed.  Def. MSJ Br. at 11-13.

Defendants submit to the Court that they suffered great prejudice as a consequence of Plaintiff's alleged failure to timely notify them of the aforementioned potential liabilities. Indeed, Defendants contend that the late disclosure of USEPA's investigation of the Kearny property's impact on the Passaic River deprived Motor Carrier of the right to take part in the investigation and be heard on the issues at the heart of the problem. Instead, they claim, Pharmacia monopolized contacts with the USEPA in an effort to exonerate Pharmacia and place all liability at Motor Carrier's door.  *Id.*, at 13.  In addition, Defendants argue that Plaintiffs' failure to bring USEPA's investigation to the attention of any of the Defendants induced Intermodal to acquire the stock of Motor Carrier, rather than buy or lease the Kearny Property. *Id.*, at 13-14.  In effect, Defendants argue, Intermodal agreed to become an affiliate of Motor

---

4    Defendants insist that Pharmacia may even be deemed to have known of USEPA's claims from an earlier date, as Pharmacia allegedly received a Request for Information letter from USEPA on January 3, 1995 stating that USEPA was "investigating the presence of hazardous substances in the sediments of the Passaic River." *See* McTiernan Cert. Ex. L; Def. MSJ Br. at 11-12.

Carrier under Article 5.3 of the 1994 Agreement on the basis of incomplete information, and is now exposed to potential liability as a result of its decision to acquire Motor Carrier. *Id*., at 14. Defendants therefore claim that they relied on Pharmacia's silence with respect to USEPA's investigation, and suffered prejudice as a result of that reliance.

Pharmacia, on the other hand, contests Defendants' allegation that Pharmacia's indemnification rights under Section 2.5 of the Agreement arose in 1995 or 1996. Pharmacia explains instead that USEPA's early correspondence was nothing more than a request for information, and that Pharmacia only incurred liability for damage to the Passaic River as a result of the USEPA's March 2004 Order. Pl. Opp'n Br., at 21. In addition, Pharmacia argues that USEPA's investigation of the Kearny Property was never concealed from Defendants, as the correspondence between USEPA and Pharmacia was made available to Intermodal as early as November 1997. *See* McGahren Exhibit 21, at 3 (letter from Dr. Robert Gan of Eder Assoc. to Marshall Williams of CSX referencing, *inter alia*, the February 1995 and December 1995 Requests for Information-Diamond Alkali Superfund Site Unit).

In light of this evidence, this Court finds that there are genuine issues of material fact as to whether Pharmacia failed to disclose the USEPA investigation, whether Intermodal or Motor Carrier were induced into any course of action as a result of that failure to disclose, and whether they suffered any prejudice as a result of that inducement. The Court must therefore deny Defendants' Motion for Summary Judgment as to the doctrine of equitable estoppel.

**b.**      **Laches**

New Jersey courts have interpreted the doctrine of laches to apply when plaintiff "delay[s] for a length of time which, unexplained and unexcused, is unreasonable under the circumstances and has been prejudicial to the other party." *Mancini v. Twp. of Teaneck*, 179 N.J. 425, 437 (2004), *quoting Nw. Covenant Med. Ctr. v. Fishman*, 167 N.J. 123, 140 (2001).

As explained above, Pharmacia has offered evidence raising issues of fact as to whether it delayed disclosure of USEPA's investigation, whether any such delay was unexplained, and whether Defendants suffered any prejudice as a result.  Accordingly, this Court will deny Defendants Motion for Summary Judgment as to its defense of laches.

**3.      Defendants' Motion for Summary Judgment on Pharmacia's Breach of Contract claim.**

Defendants claim that they are entitled to summary judgment that they have no contractual obligation to indemnify Pharmacia for work performed at the request of USEPA and NJDEP, on the grounds that (i) Pharmacia failed to provide adequate notice under the Agreement and (ii) that the Agreement allegedly excludes the governmental requests at issue here from its indemnification obligation.  The Court will deny Defendants' motion on this issue.

**a.      The Notice Requirement**

Defendants argue that Article 9.12 of the Agreement relieves them of any indemnification obligation they may have had towards Pharmacia.  Def. MSJ Br. at 18.  That provision states as follows:

> 9.12 <u>Advance Notice of Actions</u>.  Neither party shall take any action or make any communication which could reasonably be expected to have a materially adverse effect on the resolution or outcome of any matter for which the other party may be liable

14

> under Article 2 or Section 9.6 without providing at least five (5)
> business days advance notice to the other party.  Any material
> breach of this obligation shall relieve the party to whom such
> notice was not provided of liabilities and indemnification under
> Article 2 or Section 9.6 with respect to such matter to the extent
> that such non-notified party has been prejudiced by the lack of
> timely and adequate notice.  This notification requirement shall not
> apply to communications which are part of or which relate to a
> judicial or administrative proceeding in which the parties are
> litigating claims against each other.

McGahren Cert. Ex. 10, § 9.12.  Defendants claim that they never received notice of material

communications between USEPA, NJDEP and Pharmacia, and suffered prejudice as a result of

this lack of notice.

First, Defendants argue that the correspondence between USEPA and Pharmacia in 1995

and 1996 regarding the environmental impact of activities at the Kearny Property on the Passaic

River, the April 1996 and September 2003 USEPA special notice letters, and the NJDEP

September 2003 Directive, constitute exactly the type of "communication which could

reasonably be expected to have a materially adverse effect on the resolution or outcome of any

matter for which the other party may be liable" referenced in Article 9.12.  Def. MSJ Br., at 19-

20.  Defendants therefore contend that they should have been given notice of such

communications at least five days before Pharmacia responded to them.  Instead, they argue,

Pharmacia only gave Defendants notice of the communications in 2004.

Second, Defendants claim that the alleged failure to provide them with notice of said

communications caused them prejudice.  Indeed, Defendants contend that they were denied the

right to defend their position before USEPA and the NJDEP.  They claim, moreover, that

Intermodal was induced into buying Motor Carrier on the basis of incomplete information, and

15

that, as a consequence, Intermodal now finds itself potentially liable for environmental damage to the Passaic River.

Pharmacia, on the other hand, reiterates its claim that all correspondence between USEPA, NJDEP and Pharmacia was in the possession of Defendants, and disputes Defendants' allegations of prejudice.  Indeed, Pharmacia argues that Defendants have failed to show that the agencies at issue took any action that might have had a materially adverse effect on Pharmacia or Motor Carrier during the eight years during which Defendants claim they should have received notice.  Pharmacia Opp'n Br., at 17.  In fact, Pharmacia argues that no prejudice was suffered as a result of the alleged lack of notice because "prior to 2004, Pharmacia did not incur any costs of Cleanup for which it now seeks indemnification."  *Id.*, at 18.  Finally, Pharmacia contends that it answered all USEPA and NJDEP questions truthfully and completely, and that Defendants were therefore not prejudiced by any failure to include Defendants in discussions with the agencies. *Id.*

Viewing all the foregoing evidence in the light most favorable to non-movant, this Court finds that there remain genuine issues of material fact as to whether Pharmacia violated its obligations under section 9.12 of the Agreement.  Indeed, there remain genuine issues of material fact as to whether Defendants received adequate notice of Pharmacia's communications with the agencies, and whether Defendants suffered any prejudice as a result of the alleged failure to give notice.  The Court will therefore deny Defendants' Motion for Summary Judgment on this issue.

> **b.**     **The Scope of the Indemnification Obligation Under Article 2 of the Agreement.**

Defendants argue that they are entitled to summary judgment that any indemnification obligations they may have under Article 2 of the Agreement do not extend to liabilities incurred in connection with damage to the Passaic River.  This Court disagrees.

The Agreement at issue here must be interpreted under the law of the state of New Jersey.[5]  Under New Jersey law, "fundamental canons of contract construction require that we examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." *Highland Lakes Country Club & Community Ass'n v. Franzino*, 186 N.J. 99, 115 (2006), *quoting State Troopers Fraternal Ass'n v. New Jersey*, 149 N.J. 38, 47 (1997). "[W]hen the terms of a contract are clear and unambiguous, there is no room for construction and the court must enforce those terms as written."  *Watson v. City of East Orange*, 175 N.J. 442, 447 (2003), *citing Kampf v. Franklin Life Ins. Co*, 33 N.J. 36, 43 (1960).

Defendants argue that the cost of assessing and remedying damage to the Passaic River is unambiguously excluded under the Agreement from the category of costs for which Motor Carrier must indemnify Pharmacia.  Def. MSJ Br., at 23.  In particular, Defendants argue that the Agreement sets geographical, temporal and qualitative limitations on Pharmacia's indemnification obligations, all of which exonerate them from the duty to indemnify Pharmacia for those costs.[6]

---

5        Section 13.10 of the Agreement provides, in part, that "[t]his Agreement, and the rights and obligations of the parties hereunder, shall be construed in accordance with, and governed by, the law of the State of New Jersey, without giving effect to the conflict of law principles thereof."  McGahren Cert., Ex. 10, § 13.10.

17

Defendants' indemnification obligations under the Agreement are set out in Section

2.5(b) of the Agreement, which states, in part:

> Purchaser Indemnification.  Purchaser and its respective successors
> in title or interest and assigns will be liable for and will indemnify,
> save and hold harmless [Pharmacia], its Affiliates, their
> predecessors in title or interest, successors and assigns, those for
> whom [Pharmacia] would be liable and DOEA of any of the
> foregoing from and against: . . .

> (b) *any costs of Clean-up of Substances*, including but not limited
> to, any Clean-up under federal law (including but not limited to
> CERCLA, RCRA, or TSCA) or any Clean-up under the laws of the
> State of New Jersey (including but not limited to ISRA, the Spill
> Act or other action or regulations promulgated by the State of New
> Jersey) for all Substances, including but not limited to PCB's [sic]
> and Unknown ISRA/Spill Act Hazardous Material and whether or
> not such Clean-up arises from or in connection with Substances
> dumped, buried, injected, deposited or disposed of by [Pharmacia],
> its Affiliates, their respective predecessors in title or in interest,
> those claiming by, through or under the foregoing and their
> respective DOEA (except to the extent covered under Section 2.2
> of this Agreement as it pertains to the NFA Letter and performance
> of remedial or other action with respect to groundwater mandated
> by the current Work Plan and ACO or an Amendment thereto) . . .

McGahren Cert., Ex. 10, § 2.5(b) (emphasis added).

First, Defendants claim that the Agreement demonstrates "that the parties never intended

that the term "Clean-up" would be so expansive that it could include claims by governmental

agencies for *off-site action* applicable to sediments, surface water and natural resources over a

17-mile stretch of the lower Passaic River."  Def. MSJ Br. at 24 (emphasis added).  Section

2.1(c) of the Agreement defines "Clean-up" as "investigatory, remedial and monitoring work

mandated by the Requirements of Law or a Governmental Agency to investigate, remediate,

remove, treat, clean-up, contain or prevent the escape of Substances on, within, generated by or

18

emitted from any of the Kearny Site, the Plant or Property." McGahren Cert. Ex. 10, § 2.1(c). As for the property at issue in the Agreement, it is defined in part as "the real property at [Pharmacia's] Kearny Site, consisting of approximately 28 acres of land known as Foot of Pennsylvania Avenue, Kearny, New Jersey." *Id.*, § 1.2. The Defendants therefore argue that the language of the Agreement establishes indisputably that they should not be held liable under the Agreement for damage to an area remote from the Kearny Site.

Second, Defendants argue that the terms of the Agreement compel the conclusion that Motor Carrier's liability, if any, is to be limited to the "Clean-up of discharges of hazardous substances from the Kearny Site *that occurred after Motor Carrier took title*." Def. MSJ Br., at 25 (emphasis added). Indeed, Defendants point to Article 2.3 of the Agreement, which provides that Motor Carrier's liability be limited in each case to "any Substances present at or which migrate from the Kearny Site, the Plant or the Property at any time *after the Effective Time*[, December 19, 1994,] including but not limited to Substances . . . dumped, buried, injected, deposited or disposed of by [Pharmacia], its Affiliates, [and] their respective predecessors in title." McGahren Cert., Ex. 10, § 2.3 (emphasis added). Defendants conclude that since "the USEPA and NJDEP claims at issue here relate to discharges which occurred long prior to 1994, Motor Carrier need not indemnify Pharmacia." Def. MSJ Br., at 26.

Finally, Defendants argue that the types of clean-up activities covered by the indemnification clause do not include the clean-up of "sediments, surface water or natural resources". *Id.* Defendants claim that such types of clean-up are never mentioned in the Agreement, and were never discussed in the negotiations leading up to the Agreement. *Id.*, at 12-13. In fact, they argue, liability for those types of clean-up is instead specifically addressed in

19

Article 9.6 of the Agreement, which provides that Pharmacia "will remain responsible for [damage] caused or occurring prior to the Effective Time [December 19, 1994] and arising out of Monsanto's ownership, operation, maintenance or use of the Property."  McGahren Cert., Ex. 10, Section 9.6.  Defendants conclude that "[t]he contractual provision [above] unambiguously excludes the sort of claims now advanced by USEPA and NJDEP from the scope of the term "Clean-up costs."" Def. MSJ Br. at 28.

In response, Pharmacia argues that Section 2.1(c) expressly covers substances "emitted from" the Kearny Site, and concludes that Defendants' argument that clean-up indemnification obligations are limited to on-site clean-up is simply invalid.  Pharmacia Opp'n Br., at 11-12. Moreover, Pharmacia retorts that the alleged temporal limitations on Defendants' clean-up liability under the Agreement are unsupported by the text of the Agreement.  *Id.*, at 13. Pharmacia emphasizes in particular the fact that neither the definition of "Clean-up" in Section 2.1(c) of the Agreement nor the provision addressing the indemnification obligations of Motor Carrier (Section 2.5) provide for any such temporal limitation.

In addition, Pharmacia draws the Court's attention to the language of Section 9.6(b) of the Agreement, which "explicitly excludes from Pharmacia's indemnification obligations all matters covered by Article 2," *i.e.*, all indemnification for remediation responsibilities under the Agreement.  *Id.*  Pharmacia contends that Section 9.6 cannot therefore cover liability for the type of damage at issue in this case.

Finally, Pharmacia argues that N.J.S.A. 58:10-23.11b of the Spill Act defines "Clean-up and removal costs" as costs incurred mitigating "damage to the public health, safety, or welfare, including, but not limited to, public and private property, shorelines, beaches, *surface waters*,

*water columns* and bottom sediments, soils and other affected property, including wildlife and

*other natural resources* . . ." N.J.S.A. 58:10-23.11b (emphasis added), and that since the

Agreement provides that Section 2.5 would apply to any costs of cleanup under the Spill Act,

these costs should be allocated to Motor Carrier. *Id*., at 8.

In light of the foregoing evidence, and viewing all evidence in the light most favorable to

non-movant, this Court finds that there remain genuine issues of material fact as to whether the

liabilities incurred in connection with the Passaic River clean-up are excluded from Defendants'

indemnification obligations under the Agreement. The Court will therefore deny Defendants'

Motion for Summary Judgment on the issue.

> **4.      Pharmacia's Motion for Summary Judgment on Whether Motor Carrier has breached its obligation to indemnify Pharmacia for costs related to the EPA order and the NJDEP Directive.**

Pharmacia claims that is entitled to summary judgment that Motor Carrier has breached

its contractual obligation to to indemnify, save, and hold harmless Pharmacia for its costs and

liabilities under the USEPA Order and the NJDEP Directive. Pharmacia Motion - Motor Carrier,

at 18, 25. The Court disagrees.

The Court notes first that Pharmacia's argument is premised on the assumption that it has

met all of its own obligations under the Agreement. As stated above, there remained genuine

issues of material fact as to whether Pharmacia had complied with the notice requirements of the

Agreement. Accordingly, there remain genuine issues of material fact as to whether Motor

Carrier breached the Agreement, as no breach can be deemed to have occurred if Pharmacia had

previously failed to comply with a material provision of the Agreement. *See Goldman S.*

*Brunswick Partners v. Stern*, 265 N.J. Super. 489, 494 (N.J. Super. Ct. App. Div. 1993) (material

21

breach of contract by one party allows non-breaching party to "treat the contract as terminated and to refuse to render continued performance."), *quoting Ross Sys. v. Linden Dari-Delite, Inc.*, 35 N.J. 329, 341 (1961).

Moreover, even if the Court had found that Pharmacia had met all of its obligations under the Agreement, we would still deny Pharmacia's motion for summary judgment that Motor Carrier failed to meet its indemnification obligations under the Agreement. Plaintiff argues – applying the New Jersey rules of contract interpretation outlined above – that "it was the unambiguous intent of the parties that Motor Carrier would indemnify Pharmacia for all CERCLA-related costs arising at the Kearny Site." Pharmacia Motion - Motor Carrier, at 20. In addition, Pharmacia claims that under the Agreement, "Clean-up" is defined as:

> (1) investigatory, remedial and monitoring work; (2) mandated by the Requirements of Law or a Governmental Agency; (3) to investigate, remediate, remove, treat, clean-up, contain or prevent the escape of; (4) Substances on, within, generated by or emitted from the Kearny Site.

*Id.*, at 21 (quotations omitted), *quoting* McGahren Ex. 10, § 2.1(c). According to Pharmacia, Motor Carrier's obligation to indemnify Pharmacia for the CERCLA Section 107(a) response costs therefore "depends only on whether the work for which the [US]EPA seeks reimbursement and funding constitutes a "Clean-up" as defined in the Kearny Site Agreement." Pharmacia Motion - Motor Carrier, at 21. Pharmacia concludes that since the work it performed at the request of USEPA undisputably constitutes Clean-up costs under the Agreement, it is entitled to summary judgment that Motor Carrier has breached the Agreement by failing to indemnify Pharmacia for those costs. *Id.,* at 23.

Defendants, on the other hand, argue that the term "Clean-up" as used in the Agreement is ambiguous, and that there remain genuine issues of material fact whether that term encompasses the liabilities incurred by Pharmacia in connection with the USEPA and NJDEP investigations.  As a threshold matter, Defendants argue that the Agreement is not clear as to whether the costs at issue in this case would be "Clean-up" costs under Article 2.5 of the Agreement, or whether they would constitute "Incremental Costs" under Article 2.2.[6]  Motor Carrier Opp'n Br., at 22.

Second, and as discussed at length above, Defendants argue that the Agreement sets geographical, temporal and qualitative limitations on Pharmacia's indemnification rights, as a result of which the costs incurred by Pharmacia in connection with the NJDEP and USEPA investigations must be read to lie beyond the scope of the Agreement's indemnification provision.   Def. MSJ Br., at 24-27.  In essence, Defendants argue (i) that the Agreement only covered indemnification relating to the Kearny Site itself, not the abutting Passaic River, (ii) that the Agreement only contemplated indemnification for the clean-up of discharges that occurred

---

6        Section 2.2 of the Agreement provides, in part, that:

> [i]f Motor Carrier after the Effective Time is required to treat, remove, and/or dispose of an Unknown ISRA/Spill Act Hazardous Material or PCB's as part of a Government Mandated ISRA/Spill Act Clean-up, Monsanto will pay the Incremental Cost of such treatment, removal and/or disposal together with any Incremental Cost of investigation, analysis or storage of that portion of the Unknown ISRA/Spill Act Hazardous Material undisclosed to or unknown by Motor Carrier required to be remediated which was in excess of the upper concentration limits for non-reisdential use under ISRA and the Spill Act at the Effective Time for such Unknown ISRA/Spill Act Hazardous Material , and/or that portion of the PCB's which Motor Carrier proves was present in the soil or groundwater at the Plant as of the Effective Time required to be remediated solley as a result of a Change in Clean-up Standards.

McGahren Cert., Ex. 10, § 2.2.

23

after December 19, 1994, when the property was conveyed to Motor Carrier, and (iii) that the Agreement does not provide for indemnification for the clean-up of water resources. *Id.*

In light of the conflicting evidence presented by the parties, and viewing all evidence in the light most favorable to non-movant, this Court will deny Pharmacia's motion for summary judgment that Motor Carrier breached its alleged obligation under the Agreement to indemnify Pharmacia for work performed in connection with the NJDEP and EPA investigations.[7]

**5.      The Parties' Motion for Summary Judgment on Motor Carrier's obligation to indemnify Pharmacia under the Spill Act.**

Pharmacia moves for summary judgment that Motor Carrier is liable in contribution under the Spill Act, on the grounds that Pharmacia "has incurred and will incur costs of cleanup relating to a discharge for which Motor Carrier is "in any way responsible"" under the Act.  Pl. MSJ Motor Carrier Br. at 34.  Conversely, Motor Carrier moves for summary judgment that there are no grounds on which to grant Pharmacia's Spill Act contribution claim.

Section 58:10-23.11f a(2)(a) of the Spill Act, cited by both Plaintiff and Defendants, provides, in part, that:

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons *in any way responsible* for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance.

N.J.S.A. § 58:10-23.11f a(2)(a) (emphasis added). "Discharge" is defined under the Spill act as

---

7      It necessarily follows that Plaintiff's request for summary judgment that it is entitled to reverter of the interest in the Kearny property as a result of Defendants' breach of the Agreement is premature.

"any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State."  N.J.S.A. § 58:10-23.11b.

A stricter rule, however, applies in the case at bar.  Entities such as Motor Carrier who acquired, after September 14, 1993, property "on which there has been a discharge prior to the [entity's] acquisition of that property and who knew or should have known that a hazardous substance had been discharged at the real property, shall be *strictly liable*, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 215 F. Supp. 2d 482, 495 (D.N.J. 2002) (emphasis added), *quoting* N.J.S.A. § 58:10-23.11g(c)(3).[8]   In essence, "property owners are strictly liable under this provision unless an innocent purchaser defense is applicable."  *Interfaith Cmty.*, at 495.  In addition to lack of knowledge, such an innocent purchaser must demonstrate that it was

---

[8]     That section provides, in full:

> In addition to the persons liable pursuant to this subsection, any person who owns real property acquired on or after September 14, 1993 on which there has been a discharge prior to the person's acquisition of that property and who knew or should have known that a hazardous substance had been discharged at the real property, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred.  Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department or a local unit pursuant to subsection b. of section 7 of P.L. 1976, c. 141.  Nothing in this paragraph shall be construed to alter liability of any person who acquired real property prior to September 14, 1993.

N.J.S.A. § 58:10-23.11g(c)(3).

25

not, in any way, responsible for the discharge, and must show that it informed the NJDEP as

soon as evidence of the discharge was discovered.[9]

---

9       The "innocent purchaser" defense is set out in greater detail in N.J.S.A. § 58:10-23.11g (d)(2), which states, in part, that:

> (2) A person, including an owner or operator of a major facility, who owns real property acquired on or after September 14, 1993 on which there has been a discharge, shall not be liable for cleanup and removal costs or for any other damages to the State or to any other person for the discharged hazardous substance pursuant to subsection c. of this section or pursuant to civil common law, if that person can establish by a preponderance of the evidence that subparagraphs (a) through (d) apply, or if applicable, subparagraphs (a) through (e) apply:

> (a) the person acquired the real property after the discharge of that hazardous substance at the real property;

> (b) (i) at the time the person acquired the real property, the person did not know and had no reason to know that any hazardous substance had been discharged at the real property . . .

> (c) the person did not discharge the hazardous substance, is not in any way responsible for the hazardous substance, and is not a corporate successor to the discharger or to any person in any way responsible for the hazardous substance or to anyone liable for cleanup and removal costs pursuant to this section;

> (d) the person gave notice of the discharge to the department upon actual discovery of that discharge.

> To establish that a person had no reason to know that any hazardous substance had been discharged for the purposes of this paragraph (2), the person must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property. . . .

> Nothing in this paragraph (2) shall be construed to alter liability of any person who acquired real property prior to September 14, 1993 . . .

N.J.S.A. § 58:10-23.11g(d)(2).

Pharmacia claims that "discharges" occurred during its ownership of the Kearny Site, that Motor Carrier knew of such discharges, and that it nonetheless bought the property in December 1994. Pharmacia Motion - Motor Carrier, at 34-35. Motor Carrier responds to Pharmacia's allegations by citing to inapposite law, ignoring the strict liability clause of the Spill Act. Motor Carrier Opp'n Br., at 30-32. This Court is nonetheless inclined to deny Pharmacia's motion for summary judgment.

There appears to be no genuine issue of material fact that Motor Carrier was aware, at the time it purchased the Kearny Site, that hazardous substances may have been discharged *on the property* during Pharmacia's tenure. Summary judgment might therefore have been properly granted had Pharmacia sought indemnification for costs relating to the clean-up of the Kearny site itself. No evidence is offered to the Court, however, that Motor Carrier was aware of the discharge of hazardous substances *into the Passaic River – i.e.*, off-site. In fact, as explained above, Motor Carrier has consistently maintained that environmental concerns relating to zones outside of the Kearny Site itself were never brought up or taken into consideration by the parties in the run-up to the sale of the property. Def. MSJ Br., at 24. In addition, Motor Carrier strenuously denies being "in any way responsible" for any discharge on the Kearny Property or its surroundings.

Finally, while there is no evidence that the Motor Carrier immediately contacted the NJDEP upon discovery of the impact of Pharmacia's discharges on the Passaic River, the Court finds that this should not preclude Motor Carrier from trying to establish an "innocent purchaser" defense at a later time in these proceedings. Indeed, Motor Carrier alleges that it only learned of the environmental damage to the Passaic River in 2004. Since the NJDEP had obviously at that

time been handling the issue for a number of years, there was no need to inform it of the discovery.

Viewing all evidence in the light most favorable to non-movant, this Court finds that there is a genuine issue of material fact as to whether Motor Carrier was an "innocent purchaser" of the Kearny Property under N.J.S.A. § 58:10-23.11g(d)(2), and therefore, whether Motor Carrier can be held strictly liable for the discharge of hazardous material into the Passaic River. Accordingly, the Court will deny Pharmacia's Motion for Summary Judgment on the issue.  It necessarily follows that there remains a genuine issue of material fact as to whether Motor Carrier is exempt from liability under the Spill Act. Motor Carrier's motion for summary judgment on the issue will therefore also be denied.

> **6.    The Parties' Motions for Summary Judgment on the Issue of Veil-Piercing.**

Defendants argue that if the Court were to find that "either Motor Carrier or Intermodal [was] not entitled to judgment on one or more of Pharmacia's claims, then . . . neither CSX (as the parent of Intermodal) nor Intermodal (as the parent of Motor Carrier) [would] be held deviating [sic] liable for any actions of its subsidiary."  Def. MSJ Br.,  at 39.  Pharmacia, for its part, moves the Court to pierce the corporate veil and find that Intermodal is liable for Motor Carrier's liabilities and obligations.  Pharmacia Motion - Intermodal, at 16.  This Court finds that it would be proper in this case to pierce the veil to hold Intermodal liable for Motor Carrier's liabilities, but finds that there is a genuine issue of material fact as to whether veil-piercing is appropriate to hold CSX liable for Intermodal's liabilities.

a.       **Veil-Piercing Standard.**

The law of the State of New Jersey is premised on the understanding that a corporation is an entity separate from its stockholders. *Lyon v. Barrett*, 89 N.J. 294, 300 (1982). Under the equitable doctrine of veil piercing, however, "the protections of corporate formation are lost and the parent corporation may be found liable for the actions of the subsidiary." *Verni v. Stevens*, 387 N.J. Super. 160, 199 (N.J. Super. Ct. App. Div. 2006) (quotations omitted), *quoting Interfaith Cmty.*, at 497. In that regard, "piercing the corporate veil is not technically a mechanism for imposing 'legal' liability, but for remedying the fundamental unfairness [that] will result from a failure to disregard the corporate form." *Verni*, at 199 (quotations omitted), *quoting Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 193 (3d Cir. 2003). "In the absence of fraud or injustice, courts generally will not pierce the corporate veil to impose liability on the corporate principals." *Lyon*, at 300, *citing Frank v. Frank's, Inc.*, 9 N.J. 218, 224 (1952). The court in *Verni* went on to explain that:

> in order to warrant piercing the corporate veil of a parent corporation, a party must establish two elements: 1) that the subsidiary was dominated by the parent corporation, and 2) that adherence to the fiction of separate corporate existence would perpetrate a fraud or injustice, or otherwise circumvent the law. *Ventron, supra*, 94 N.J. at 500-01, 468 A.2d 150. In determining whether the first element has been satisfied, courts consider whether "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." *Id*. at 501, 468 A.2d 150. *See Interfaith, supra*, 215 F. Supp. 2d at 497 ("veil-piercing is proper when a subsidiary is an alter ego or instrumentality of the parent corporation"). In determining corporate dominance, courts engage in a fact-specific inquiry considering whether the subsidiary was grossly undercapitalized, the day-to-day involvement of the parent's directors, officers and personnel, and whether the subsidiary fails to observe corporate formalities, pays no dividends, is insolvent, lacks corporate

records, or is merely a facade. *Bd. of Trs. v. Foodtown, Inc.*, 296
F.3d 164, 172 (3d Cir. 2002) . . .

*Verni*, 387 N.J. at 199-200.

### b.  Motor Carrier/Intermodal Veil

Defendants' argument is limited only to asserting that while Motor Carrier is wholly-owned by Intermodal, and while Intermodal is wholly owned by CSX, their relationship is nothing more than a "garden-variety parent-subsidiary" one.  Def. MSJ Br., at 39.[10] Unsurprisingly, Pharmacia takes exception to this characterization, both in its objection to Defendants' Motion for Summary Judgment and in its own Motion for Summary Judgment against Intermodal.

Pharmacia points out first that "Motor Carrier is indisputably undercapitalized." Pharmacia Motion - Intermodal, at 18.  Indeed, Defendants do not contest that Motor Carrier has no revenues, and has not had a balance sheet nor issued financial reports since 1998.  Pl. R. 56.1 Statement ¶¶ 104-05, Def. R. 56.1 Counterstatement ¶¶ 104-05.  Pharmacia concludes that Motor Carrier cannot demonstrate that it has the funds to cover any potential liabilities that may arise as a result of these proceedings.  Pharmacia SMJ Intermodal, at 18.

---

10      Intermodal argues that the doctrine of veil-piercing only comes into play upon issuance of a judgment against a subsidiary, but fails to offer any controlling authority in this jurisdiction for that proposition of law.  The Court is unaware of any at this time.  The main case cited by Intermodal, *Casini v. Graunstein*, 307 B.R. 800, 811 (Bankr. D.N.J. 2004) is inapposite.  Indeed, while the court in that case held that "[b]efore invoking the doctrine [of veil-piercing,] a plaintiff must first establish an independent basis to hold the corporation liable," *id*, it went on to declare that "[h]aving established corporate liability for a tort or breach of contract, if the corporate defendant has insufficient assets to satisfy a *prospective* judgment, the plaintiff may then seek to pierce the veil."  *Id.* at 811-12 (emphasis added). The Court does not interpret this language to mean that the basis for the judgment must be settled by judgment (summary or otherwise) before the doctrine of veil-piercing can be addressed.

In addition, it is beyond contention that Motor Carrier has no employees, and exists solely as a holding company for the Kearny Property.  Pl. R. 56.1 Statement ¶¶ 103, 106, Def. R. 56.1 Counterstatement ¶¶ 103, 106. Finally, Defendants do not dispute that "[s]ince the closing in January 1998, neither the shareholders, officers nor directors of Motor Carrier have held a meeting as set forth in the company's by-laws."  Pl. R. 56.1 Statement ¶ 101, Def. R. 56.1 Counterstatement ¶ 101.

For the foregoing reasons, this Court finds that there is no genuine issue of material fact that piercing the veil between Intermodal and Motor Carrier is appropriate here under *Verni*. There is no genuine issue of material fact that the parent (Intermodal) dominates its wholly-owned subsidiary (Motor Carrier), and that given Motor Carrier's inability to satisfy a potential adverse judgment, adherence to the fiction of a separation between Intermodal and Motor Carrier would perpetrate an injustice.  The Court will therefore deny Defendants' Motion for Summary Judgment on the issue of veil-piercing, and grant Pharmacia's motion on the same issue.

### c. Intermodal/CSX Veil

Defendants also argue that they are entitled to summary judgment that Intermodal and CSX are to be considered distinct entities for the purposes of establishing liability in this case.

Defendants offer little evidence to support their contention that CSX may not be held accountable for Intermodal's liabilities.[11]  Plaintiff, on the other hand, argues that CSX has

---

11      In fact, Defendants do little more than assert that:

> Motor Carrier is a wholly owned subsidiary of Intermodal, and Intermodal, in turn, is a wholly owned of [sic] subsidiary of CSX. . . . [T]he record contains no evidence suggesting anything other than garden-variety parent-subsidiary relationships between Intermodal and Motor Carrier, and between CSX and Intermodal. . . .
> The undisputed facts here do not permit veil-piercing under New Jersey law. Instead, they demonstrate only normal parental oversight of subsidiary

31

numerous subsidiaries, including Intermodal, that are "mere instrumentalities of the parent," as "CSX maintains a cash pool from which each subsidiary draws to operate its own functions."  Pl. Opp'n Br., at 27.  Moreover, Plaintiff insists that CSX's subsidiaries do not issue annual financial reports, but instead rely on CSX to issue reports encompassing all subsidiaries. Finally, Plaintiff claims that veil-piercing is appropriate because all of Intermodal's expenditures have to be approved by the Chairman of CSX.  Pl. Opp'n Br., at 27.

Viewing all evidence in the light most favorable to non-movant, this Court finds that there remains a genuine issue of material fact as to whether piercing the corporate veil between Intermodal and CSX would be appropriate under *Verni*.  Accordingly, the Court will deny Defendants' motion for summary judgment on this issue.

### 7.    Pharmacia's Motion for Summary Judgment on Intermodal's Status as an "Affiliate" of Motor Carrier under the Agreement.

Pharmacia claims that it is entitled to summary judgment that Intermodal assumed the responsibilities of Motor Carrier under the Agreement by expressly acknowledging that it was an "Affiliate" of Motor Carrier under the Agreement.  The Court will deny Pharmacia's motion on this issue.

Affiliates are defined under the Agreement as follows:

> "Affiliate" of a specified party means any other present or future person (including individuals, corporations and other legal entities) directly or indirectly controlling or controlled by or under direct or indirect common control with, such specified party. For purposes of this definition, "control" when used with respect to a specified

---

corporations – no domination by the parent, no blurring between parent and subsidiary, no loss of the subsidiary's separate existence, no abuse of the corporate form by the parent to perpetrate a fraud or any sort of injustice.

Def. MSJ Br. at 39-41.

> person or party means the management and policies of such person
> or party directly or indirectly, whether by ownership of voting
> securities, by contract or otherwise; and the terms "controlling"
> and "controlled" have meanings correlative to the foregoing.

McGahren Cert., Ex. 10, § 2.1(a).  Classification as an Affiliate is significant, because under section 13.19 of the Agreement:

> [i]f at the end of any calendar quarter the [net worth of Motor
> Carrier] shall be less than Five Million Dollars . . . then the
> Purchaser shall promptly notify [Pharmacia] and, within fifteen
> (15) days and from time to time thereafter until [Pharmacia] has
> been provided with financial assurance . . . , shall cause Affiliates
> to become Assurance Affiliates by causing them . . . to become
> parties to this Agreement, to guaranty and/or to otherwise become
> liable for the obligations under the Agreement . . . to the same
> extent as [Motor Carrier] . . .

*Id.*, § 13.19.  Pharmacia alleges that Intermodal was an Affiliate of Motor Carrier under Section 2.1 – as it controlled all of Motor Carrier's shares – and that when Motor Carrier allegedly failed to notify Pharmacia that its net worth had dipped below the five million dollar threshold, it became responsible for all of Motor Carrier's liabilities under the Agreement.

The Court, however, finds that Pharmacia's motion on this issue is premature.  As discussed above, it remains unclear whether Pharmacia fulfilled its own obligations under the Agreement.  The Court must decline to issue summary judgment on the issue of Intermodal's liability under the Agreement when the issue of Pharmacia's right to enforce any of the provisions of the Agreement is still undecided.  *Goldman*, 265 N.J. Super. at 494 (N.J. Super. Ct. App. Div. 1993) (material breach of contract by one party allows non-breaching party to "treat the contract as terminated and to refuse to render continued performance."), *quoting Ross*, 35 N.J. at 341.  Pharmacia's motion for summary judgment on this issue is therefore denied.

**III.      CONCLUSION**

For the foregoing reasons, the Court will grant Pharmacia's Motion for Leave to Further Amend its Complaint, deny Defendants' Motion for Summary Judgment, deny Pharmacia's Motion for Summary Judgment against Motor Carrier, and grant in part and deny in part Pharmacia's Motion for Summary Judgment against Intermodal.  An appropriate form of Order accompanies this Memorandum Opinion.

Dated December 7, 2006

　  s/ Garrett E. Brown, Jr.　　　
GARRETT E. BROWN, JR., U.S.D.J.

34