NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

PHARMACIA CORPORATION
(f/k/a Monsanto Company),

       Plaintiff,

         v.

MOTOR CARRIER SERVICES CORP., CSX
INTERMODAL, INC., CSX CORPORATION,
G.O.D., INC., and RILEY LEASING CORP.,

       Defendants.
_____

Civ. No. 04-3724  (GEB)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## BROWN, Chief Judge

      This matter comes before the Court upon the Complaint of plaintiff Pharmacia

Corporation ("Pharmacia") alleging that Defendants Motor Carrier Services Corp. ("Motor

Carrier"), CSX Intermodal, Inc. ("Intermodal"), CSX Corporation ("CSX"), G.O.D., Inc.

("G.O.D.") and Riley Leasing Corp.'s ("Riley Leasing") (collectively "Defendants") are liable for

the costs of environmental clean-up incurred in connection with a 28-acre piece of property

abutting the Passaic River in Kearny, New Jersey (the "Kearny Property").  The Court conducted

a non-jury trial from January 3 to January 11, 2007, and had the opportunity to observe the

manner and demeanor of the witnesses and to assess their credibility.  *See United States v.

$33,500 in U.S. Currency*, No. 86-3348, 1998 U.S. Dist. LEXIS 19475, at *2 (D.N.J. Aug. 17,

1988).  This Opinion constitutes this Court's findings of fact and conclusions of law in

accordance with Federal Rule of Civil Procedure 52(a).

I.      BACKGROUND

        A.      THE PARTIES

        Pharmacia is a corporation organized under the laws of the State of Delaware.  (Second

Am. Compl. ¶ 7.)  Pharmacia changed its name from Monsanto Company in March 2000.

(Pretrial Order at ¶ 1.) Pharmacia retained Monsanto's contractual rights under the Kearny Site

Purchase and Sale Agreement (the "Agreement").  (*Id.*) The company now known as Monsanto

Company has never owned or operated the Kearny Property.  For the sake of clarity, this Opinion

will refer to plaintiffs as "Pharmacia."

        Motor Carrier is a company organized under the law of the State of New Jersey.  (*Id.* at ¶

2.)  Intermodal and CSX are corporations organized under the law of the State of Virginia.  (*Id.* at

¶¶ 3-4.) At all times relevant to this action, Intermodal was a wholly-owned subsidiary of CSX.

(*Id.* at ¶ 4.)

        B.      THE KEARNY SITE

        Between 1956 and 1991, Pharmacia manufactured chemicals at the Kearny Site,

including phosphoric acid, steroxes and alkylphenol.  (*Id.* at ¶ 6.)  Motor Carrier owned a 6-acre

parcel of land across the street from the Kearny Site (the "G.O.D. parcel").  (*Id.* at ¶ 45.)  On

June 1, 1988, Pharmacia leased 9 acres of the Kearny Site to third parties.  (*Id.* at ¶ 7.)  In 1991,

Pharmacia ceased all activities on the Kearny Site.  (*Id.* at ¶ 9.)

        On April 4, 1994, Motor Carrier and Pharmacia signed a Letter of Intent concerning the

sale of the Kearny Site. On December 19, 1994, Pharmacia, as seller, and Motor Carrier, G.O.D.

Inc., Riley Leasing Corp. and Seigles Express, Inc. as purchasers, entered into the Agreement for

the sale of the Kearny Site.  (*Id.* at ¶ 26.)  Motor Carrier was granted title to the Kearny Site.

2

(*Id.* at ¶ 27.)

During late 1997, CSX Real Property, Inc. ("CSX Real Property"), a subsidiary of CSX Corp., was looking to acquire property on the Kearny Peninsula on behalf of its client Intermodal.  (*Id.* at ¶ 46.)  CSX Real Property agreed to purchase the Kearny Site and the G.O.D. Parcel from Motor Carrier for $425,000 per acre.  (*Id.* at ¶ 51.) CSX Real Property and Intermodal conducted the due diligence on the environmental conditions at the Kearny Site. (*Id.* at ¶ 52.)

On November 19, 1997, Brian Fleisig ("Fleisig"), then counsel for Motor Carrier, forwarded to Ed McTiernan ("McTiernan"), then counsel to Intermodal and CSX Real Property, a "Release and Waiver," which included, as Appendix A, a list of all documents provided by Motor Carrier to CSX Real Property relating to environmental hazards. (*Id.* at ¶ 53.)

In November 1997, CSX Real Property's consultant, Eder Associates ("Eder Associates") visited the offices of counsel for Motor Carrier to review documents in Motor Carrier's possession.  (*Id.* at ¶ 56.)  On December 12, 1997, CSX Real Property reached an agreement with the shareholders of Motor Carrier (the "Stock Purchase Agreement") to acquire the shares of Motor Carrier for $14,450,000 and/or lease the Kearny Site.  (*Id.* at ¶ 57.)  The parties acknowledged Motor Carrier's environmental liabilities in the Stock Purchase Agreement. (*Id.* at ¶ 59.)  On January 5, 1998, Pharmacia requested that Motor Carrier and CSX Real Property provide an assurance that Motor Carrier's net worth was at least $5 million. (*Id.* at ¶ 64.) In October 1997, Deloitte & Touche issued financial statements revealing that Motor Carrier's net worth was approximately $340,000.  (*Id.* at ¶ 73.)

On January 6, 1998, CSX Real Properties Inc. assigned its rights under the December 12,

1997 agreement to Intermodal.  (*Id.* at ¶ 66.) On January 7, 1998, Pharmacia notified Intermodal

that Motor Carrier was not, at the time, in default under the 1994 Agreement.  (*Id.* at ¶ 67.)

Intermodal did not exercise its option to lease the Kearny Site, and on January 7, 1998,

acquired all of the shares of Motor Carrier.  (*Id.* at ¶¶ 68, 72.)  Since the closing, in January 1998,

neither the shareholders, officers nor directors of Motor Carrier have held a meeting as set forth

in the company's by-laws. (*Id.* at ¶ 96.)  Moreover, Motor Carrier has not, in that time,

maintained a balance sheet, nor issued a financial report to Intermodal.  (*Id.* at ¶ 99.)

### C.    THE NJDEP ACTION

In July 1989, Pharmacia and the New Jersey Department of Environmental Protection

("NJDEP") entered into an Administrative Consent Order ("ACO").  (*Id.* at ¶ 8.) Under the ACO,

Pharmacia conducted a Remedial Investigation and Feasibility Study ("RI/FS") to investigate the

contamination of the Kearny Site and assess possible remediation strategies.  (*Id.* at ¶ 10.)  Three

particular areas of concern were highlighted: the Alkylphenol/Sterox Sump, the Secondary

Settling Pond, and the PCB Disposal Area.  (*Id.* at ¶ 11.)  Pharmacia and NJDEP agreed that

Pharmacia needed to conduct soil excavation, treatment and disposal of the soil, in-site treatment

actions, soil containment actions and institutional controls.  (*Id.* at ¶ 12.)  No remediation of

groundwater was mandated.  (*Id.* at ¶ 13.)  On August 4, 1993, Pharmacia submitted a

Preliminary Action Work Plan to the NJDEP, under which it identified eight tasks to be

completed in order to facilitate removal of contaminated soils from the subsurface:

> (1) installation of sheet-piling
> (2) dewatering
> (3) mobilization of equipment
> (4) excavation
> (5) backfilling

> (6) treatment and disposal of soils and extracted water
> (7) capping and monitoring and
> (8) final reporting to NJDEP.

(*Id.* at ¶¶ 15-16.)  The Work Plan did not provide for the treatment and remediation of groundwater, but did call for groundwater monitoring to assess the effectiveness of the soil remediation process.  (*Id.* at ¶¶ 17-18.)  Upon completion of the remedial action, Pharmacia submitted a Remedial Action Report ("Remedial Report") to the NJDEP on November 11, 1994. (*Id.* at ¶ 20.)  The Remedial Report indicated that PCB-impacted soils had been removed in the three areas of concern, and directed Pharmacia to install an asphalt cap over those areas.  (*Id.* at ¶¶ 21-22.)  The Remedial Report also mandated post-remediation groundwater sampling, but did not discuss remediation of ground water.  (*Id.* at ¶¶ 22-23.) On August 2, 1994, Pharmacia began the long-term groundwater monitoring required by the Work Plan.  (*Id.* at ¶ 24.) The Remedial Report required semi-annual sampling for PCBs for three years starting in January 1995 followed by two years of annual sampling.  (*Id.* at ¶ 38.)

On December 15, 1995, NJDEP issued a No Further Action ("NFA") letter for soils at the Kearny Site, noting that groundwater monitoring would continue pursuant to the Work Plan and ACO.  (*Id.* at ¶¶ 33-34.)  In accordance with the Report, Pharmacia conducted groundwater sampling semi-annually in 1995, 1996 and 1997, and annually in 1998 and 1999. (*Id.* at ¶ 39.) PCBs were not detected at any of those times.  (*Id.* at ¶ 40.)  On December 20, 2001, NJDEP received Pharmacia's final report that no PCBs had been detected in the groundwater samples for the entire 5-year monitoring period.  (*Id.* at ¶ 79.)   The monitoring had detected chlorobenzene and benzene contamination, but the NJDEP concluded that this contamination emanated from an off-site source and did not require further remedial action.  (*Id.* at ¶¶ 80-81.)  NJDEP only

required that Pharmacia conduct further investigation with respect to benzene in the groundwater, or establish a Classification Exception Area.  (*Id.* at ¶¶ 82-83.)

On September 19, 2003, Pharmacia and Motor Carrier received an administrative directive from NJDEP (the "Directive") concerning the Passaic River. (*Id.* at ¶ 85.)  On October 14, 2004, Pharmacia joined the Lower Passaic River Study Area Cooperating Parties Group.  (*Id.* at ¶ 91.)

### D.    THE USEPA ACTION

On January 3, 1995, the United States Environmental Protection Agency ("USEPA") issued a Request for Information to Pharmacia (the "First RFI") regarding the Passaic River Study Area.  (*Id.* at ¶ 28.)  Pharmacia responded to the First RFI on February 3, 1995, and supplemented that response on March 7, 1995. (*Id.* at ¶¶ 30-31.) On November 14, 1995, Pharmacia received a second RFI from USEPA (the "Second RFI") (*Id.* at ¶ 32.)  Pharmacia responded to the Second RFI on December 29, 1995.  (*Id.* at ¶ 41.)  On April 26, 1996, Pharmacia received a general notice letter from USEPA regarding the Passaic River, which was followed on August 7, 1996 by a letter from USEPA inviting Pharmacia to a meeting of parties potentially responsible for damage to the Passaic River.  (*Id.* at ¶¶ 42-43.)

On March 10, 2004, USEPA issued to Pharmacia a Final Draft Administrative Order on Consent in *In re Lower Passaic River Study Area Portion of the Diamond Alkali Superfund Site* (CERCLA Docket No. 02-2004-2011) ("USEPA Order") pursuant to Section 107 and 122 of CERCLA.  (*Id.* at ¶ 88.)  On June 6, 2005, Pharmacia executed Amendment No. 1 to the USEPA Order, and thereby became a settling party. (*Id.* at ¶ 92.)

6

E.      PROCEDURAL HISTORY

On March 19, 2004, Pharmacia notified Motor Carrier of the USEPA Order and the

NJDEP Directive and demanded indemnification for all costs related to the USEPA Order and

the NJDEP Directive.  (*Id.* at ¶ 90.)  On May 11, 2004, Motor Carrier responded and refused to

indemnify Pharmacia.  (*Id.*) Pharmacia filed a Complaint against the Defendants in connection

with the Kearny Property on August 5, 2004 , then filed an Amended Complaint on April 11,

2005, and finally a Second Amended Complaint on December 8, 2006 (the "Second Amended

Complaint").  This matter was tried in a non-jury trial beginning on January 3, 2007.  After both

parties had presented their case to the Court, the undersigned directed the parties to arbitration.

The arbitration proved unfruitful.  It is therefore incumbent upon this Court to issue a judgment

on the basis of the evidence set forth at trial.  Before analyzing that evidence, however, the Court

will rule on all outstanding motions.

II.     DISCUSSION

A.      OUTSTANDING MOTIONS

1.      Defendants' Motion for Reconsideration

On December 14, 2006, Defendants filed a motion for reconsideration of this Court's

December 7, 2006 summary judgment opinion piercing the corporate veil between Intermodal

and Motor Carrier.  In the District of New Jersey, Local Civil Rule 7.1(i) governs motions for

reconsideration.  L. Civ. R. 7.1(i).  The movant has the burden of demonstrating either: "(1) an

intervening change in the controlling law; (2) the availability of new evidence that was not

available when the court [issued its order]; or (3) the need to correct a clear error of law or fact or

to prevent manifest injustice."  *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir.

1999), *citing N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995).  The

Court will grant a motion for reconsideration only where its prior decision has overlooked a

factual or legal issue that may alter the disposition of the matter.  *United States v. Compaction*

*Sys. Corp.*, 88 F. Supp. 2d 339, 345 (D.N.J. 1999); *see also* L. Civ. R. 7.1(i). The Court holds

that it did not overlook controlling legal authority nor dispositive facts in piercing the corporate

veil between Intermodal and Motor Carrier, and will therefore deny Defendants' motion for

reconsideration.

> 2.    Defendants' Motion to Dismiss

In addition, on December 27, 2006 Motor Carrier filed a motion to dismiss Pharmacia's

Second Amended Complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(3).  A

rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted must

be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957);

*McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246 (1980).  "The question before

the court is not whether plaintiffs will ultimately prevail; rather, it is whether they can prove any

set of facts in support of their claims that would entitle them to relief."  *Mobile Dredging &*

*Pumping Co. v. City of Gloucester*, No. 04-0624, 2005 U.S. Dist. LEXIS 16601, at *7 (D.N.J.

Aug. 4, 2005), *citing Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  "Therefore, in

deciding a motion to dismiss, a court should look to the face of the complaint and decide

whether, taking all of the allegations of fact as true and construing them in a light most favorable

to the nonmovant, plaintiff's allegations state a legal claim."  *Mobile Dredging*, at *7, *citing*

*Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990).

Looking to the face of the Second Amended Complaint, and viewing all allegations in the light most favorable to non-movant, the Court holds that Pharmacia has set forth a legal claim for the right to reenter the property.  Accordingly, the Court denies Defendants' 12(b)(6) motion to dismiss.

In connection with their 12(b)(3) motion to dismiss on the grounds of improper venue, Defendants claim that the issue of Plaintiff's right to reenter the property under Section 1.5 of the Agreement cannot be brought before this Court because it is allegedly not "a court of competent jurisdiction in Hudson County, New Jersey."  The Court finds that argument unconvincing. Indeed, there is no dispute that this Court has subject matter jurisdiction over this matter, and that venue is proper, as:

> [i]n a civil action based on federal question jurisdiction, venue can be laid in a judicial district (1) in which the defendants reside, if all defendants reside in the same state, (2) where a substantial part of the events or omissions giving rise to the claim occurred, or (3) where any defendant may be found if there is no district in which the action otherwise might be brought. 28 U.S.C § 1391(b).

*Aventis Pharma. S.A. v. Sandoz, Inc.*, No. 06-3671, 2007 U.S. Dist. LEXIS 26304, at *5 (D.N.J. April 10, 2007).  Since the Court may hear the questions of law at issue in this case whether they arise in Hudson County, New Jersey, or elsewhere in the district, it must be deemed "a court of competent jurisdiction" under the Agreement.  The Court's finding that it is a proper venue for claims relating to Section 1.5 is buttressed by Section 13.10, which states that "the courts of either/both) the State of New Jersey (and/or) the United States District Court for the District of New Jersey shall have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement." Agreement, Ex. J-5 at § 13.10.  Accordingly, Defendants'

motion to dismiss under Rule 12.3(b) is denied.

> ### 3.       Plaintiff's Motion in Limine

Finally, on January 18, 2007, Pharmacia filed a motion in limine to exclude the testimony of David Bowling. Under Federal Rule of Civil Procedure 37,

> [a] party that without substantial justification fails to disclose
> information required by Rule 26(a) or 26(e)(1), or to amend a prior
> response to discovery as required by Rule 26(e)(2), is not, unless
> such failure is harmless, permitted to use as evidence at a trial, at a
> hearing, or on a motion any witness or information not so
> disclosed.

FED. R. CIV. P. 37(c)(1).  Pharmacia argues that Defendants have steadfastedly refused to produce certain documents it seeks, and that the testimony of CSX's 30(b)(6) representative, Mr. Bowling, should therefore be excluded.  The Court, however, finds that Pharmacia has failed to establish that it suffered prejudice as a result of Defendants' alleged failure to produce, a conclusion buttressed (i) by the fact that Pharmacia never sought the assistance of the Court, prior to trial in compelling the production of said documents, and (ii) by the fact that Pharmacia failed to identify any part of Mr. Bowling's testimony relating to information it sought but never received.  Under such circumstances, the Court is reluctant to exclude the testimony of Mr. Bowling, and will therefore deny Pharmacia's motion in limine.

> ## B.       THE PARTIES' CONTENTIONS AT TRIAL

> ### 1.       Pharmacia's Claims

> > #### i.       Pharmacia's claim that Motor Carrier assumed responsibility,
> > under the Agreement, for the clean-up costs at issue.

Pharmacia contends that both the language of the Agreement and the testimony offered at trial compel the conclusion that any liability for the clean-up costs incurred by Pharmacia

should be assigned, under the Agreement, to Defendants.

### a.     Language of the Agreement

Pharmacia argues that in attempting to sell the Kearny Site, it sought to (1) obtain a reasonable price for the property, (2) carve out a limited set of environmental clean-up responsibilities for which it would remain responsible and (3) expressly transfer all other environmental responsibilities and liabilities to the purchaser.

First, Pharmacia argues that Section 2.2 of the Agreement establishes that it retained only a limited set of responsibilities relating to the environmental clean-up under the NJDEP's ACO and the Work Plan (and any modifications to the Work Plan suggested by the NJDEP) – a set of responsibilities that did not encompass the clean-up activities for which it now seeks contribution from Defendants.  Pl. Br. at 3-4.  According to Pharmacia, Section 2.2 of the Agreement mandates that it complete the remediation required under the ACO "*with respect to soil* or soil media for Substances," and requires that Pharmacia "perform such required remedial action or take other action with respect to such Substances *in soil or soil media* for which [Pharmacia] is responsible to the extent necessary to furnish [the] NFA Letter . . ."  *Id.* at 4, *quoting* Agreement, Ex. J-5 at § 2.2 (emphases added).  While Pharmacia acknowledges that it maintained some responsibility with respect to the clean-up of groundwater, it insists that such responsibility did not extend to the clean-up at issue here.  Indeed, Pharmacia argues that it was only required, under Section 2.2, to "perform groundwater monitoring to verify that the soil remedy did not adversely impact groundwater."  Pl. Br. at 4.

Second, Pharmacia argues that Motor Carrier expressly took on the responsibility, under Section 2.3 of the Agreement, "for any and all costs and expenses of a Clean-up, including any

11

costs of a Clean-up arising under federal or New Jersey law, as well as attorneys fees." *Id.* at 5. Pharmacia highlights that "Clean-up" is defined in the Agreement as "investigatory, remedial and monitoring work mandated by the Requirements of Law or a Governmental Agency to investigate, remediate, remove, treat, clean-up, contain or prevent the escape of Substances on, within, generated by or *emitted from* any of the Kearny Site, the Plant or Property." *Id.*, *quoting* Agreement, Ex. J-5 at § 2.1(c) (emphasis added).  Pharmacia concludes that "[t]he only limitation on Motor Carrier's environmental responsibility is that Pharmacia agreed to continue the remedial action it was conducting under the ACO."  Pl. Br. at 5, *citing* Agreement, Ex. J.5 at §§ 2.2-2.3.

Third, Pharmacia maintains that Section 2.4 of the Agreement narrowly defines its indemnity obligations.  Pl. Br. at 5. Pharmacia notes that "[p]ursuant to Section 2.4, [it] is required to indemnify Motor Carrier for all costs arising from its failure to complete its obligations under Section 2.2."  *Id.*, *citing* Agreement, Ex. J-5 at § 2.4.  While Pharmacia concedes that it is also, under that Section, "obligated to indemnify, or reimburse, Motor Carrier for 'Incremental Costs'", it contends that these are not an issue "because they relate solely to costs incurred as a part of a 'Government Mandated ISRA/Spill Act Cleanup,' which is defined as cleanups required by NJDEP as part of Motor Carrier's continued use of the property, or required upon Motor Carrier's transfer of title to a third-party."  Pl. Br. at 5-6. Moreover, Pharmacia argues that the CERCLA costs associated with the USEPA Order cannot constitute "Incremental Costs," as the term "Incremental Costs" refers only to "costs incurred as part of an ISRA/Spill Act-mandated cleanup *at the Plant*," whereas the claims in this case relate to contamination that emanated beyond the confines of the Plant.  *Id.* at 6 (emphasis in original),

12

*citing* Agreement, Ex. J-5 at § 2.1(g).

Fourth, Pharmacia claims that under Section 2.5 of the Agreement, "Motor Carrier agreed to indemnify, defend and hold Pharmacia harmless from 'any and all costs' of a 'Cleanup' of 'Substances.'" Pl. Br. at 6, *citing* Agreement § 2.5(b). Pharmacia maintains that the "Agreement specifically anticipates that such Clean-ups will arise under CERCLA and the Spill Act, and specifically assigns responsibility for such to Motor Carrier." *Id.* at 6. Pharmacia adds that under the Agreement, "responsibility for Clean-up extends to substances present at or which migrate from the Kearny Site after the closing, including PCBs, and regardless if 'dumped, buried, injected, deposited or disposed of by' Pharmacia during its period of ownership." Pl. Br. at 6, *quoting* Agreement, Ex. J-5 at § 2.5.

Finally, Pharmacia urges the Court to reject Motor Carrier's argument that its responsibility under Section 2.3 with respect to liability for clean-up is limited to Substances emitted *after* the Effective time (i.e., the date of the Agreement, December 19, 1994). Pl. Br. at 6-7. Indeed, Pharmacia contends that "[t]his interpretation ignores the clear grammatical construction of the provision . . . ." *Id.* at 7. According to Pharmacia, the post-Effective Time limitation "only applies to matters addressed under Section 2.3(ii), which are "voluntarily incurred costs." *Id.* at 7. Pharmacia maintains that Motor Carrier's interpretation of Section 2.3 to include such a temporal limitation renders Sections 2.2, 2.4, and 2.5 – none of which contain such a limitation – meaningless. *Id.* at 7.

        b.    *The parties' stipulations and the Testimony Presented at trial*

Pharmacia contends that its interpretation of the Agreement is fully supported by the

parties' stipulations and the testimony offered at trial.  *Id.* at 9.  Indeed, Pharmacia argues that

Jeffrey Felder, Pharmacia's lead negotiator for the Agreement, testified that Article 2 was

"broadly written with respect to what the buyer assumed and frankly fairly narrowly written as to

what Pharmacia retained." Pl. Br. at 8, *quoting* 1/3/07 A.M. Tr. at 70:19-21.  Mr. Felder

explained that Pharmacia "reserved certain specified liability unto itself, and in [Pharmacia's]

view the buyer accepted everything that [Pharmacia] didn't expressly retain."  Pl. Br. at 8,

*quoting* 1/3/07 A.M. Tr. at 71:10-13.

        In addition, Pharmacia argues that the testimony offered at trial undercuts Motor Carrier's

argument that "the context of the Agreement demonstrates that the parties never intended [for]

the term 'Clean-up' [to] be broad enough to include claims by governmental agencies for off-site

action applicable to sediments, surface water and natural resources."  Pl. Br. at 9.  Pharmacia

insists that Motor Carrier had full knowledge in 1994 of the potential connection between the

Site and the Passaic River, noting (i) that "the Agreement incorporates by reference the ACO . . .

[which] clearly demonstrates that in 1989 Pharmacia was required to study potential impact to

the Passaic River as part of its remedial obligations," *id.* at 9, and (ii) that the Remedial

Investigation Scope of Work "included a determination of 'migration path of pollutants through

air, soil, ground water, surface water and sediment." *Id.* Indeed, according to Pharmacia, Greg

Martin, of Roux Associates (the consultants responsible for implementing Pharmacia's

obligations under the ACO and the Work Plan) testified that "the ACO required Pharmacia to

determine potential impacts to surface water in general, and specifically *to the Passaic River*."

Pl. Br. at 10, *citing* 1/4/07 A.M. Tr. at 139:21-25.  Roux conducted soil and groundwater

sampling at the time, and came to the conclusion that the contamination was localized – i.e., that

there was no migration of contaminants from the site to the river.  Pl. Br. at 10, *citing* 1/4/07

A.M. Tr. at 143:13-17, 10:5-6.

That Motor Carrier knew that it was assuming responsibility for costs of clean-up is

further buttressed, according to Pharmacia, by the fact that the list of documents provided by

Pharmacia to Motor Carrier's attorneys, at Jeffrey Felder's request, included a number of

documents "that reflect[ed] Pharmacia's and NJDEP's concern for sediments and surface water."

Pl. Br. at 11.   One of these documents was a June 12, 1992 letter from Roux to Pharmacia.

While Roux in that letter "concluded that under a worst-case-scenario PCB discharges to the

Passaic River would be at non-actionable levels," the letter calls into question Motor Carrier's

claim that Pharmacia's remedial activities "did not address or investigate the potential impact to

the sediments and surface waters of the Passaic River."  Pl. Br. at 11, *citing* Ex. P-80.

To the extent it did retain any responsibility for the clean-up under the Agreement, and in

particular, under Section 2.2 of the Agreement, Pharmacia argues that it has met all of its

obligations.  Pl. Br. at 12.   Indeed, Pharmacia argues that the parties do not dispute that:

- Pharmacia conducted a Remedial Investigation/Feasibility Study pursuant to the ACO, during the course of which Pharmacia identified three 'areas of concern,' or PCB 'hot spots'.  *Id.* at 13.

- "Pharmacia's response action at the Kearny Site would consist of soil excavation, treatment, and disposal, as well as in-situ treatment actions, soil containment actions . . . , implementing deed restrictions, and conducting groundwater monitoring for five years."  *Id.*

- "[N]o groundwater remedy was required by NJDEP under the ACO."  *Id.*

- "Pharmacia received the 'No Further Action' letter for soils required under Section 2.2 of the Contract."  *Id.*  This was confirmed by the testimony of Kathleen Moldthan.  1/5/07 A.M. Tr. at 8:16-23.

15

- "Pharmacia completed all of the post-remediation groundwater monitoring required by the Work Plan and Section 2.2 of the Agreement." Pl. Br. at 13. This was confirmed at trial by Jeffrey Klieve. 1/5/07 A.M. Tr. at 120:6-122:18.

Pharmacia also maintains that its expert, Robert Zoch, testified that Pharmacia had satisfied all the remediation requirements of the ACO and Section 2.2. Pl. Br. at 13, *citing* 1/5/07 A.M. Tr. at 33:18-34:7. In particular, Pharmacia contends that Mr. Zoch established that Pharmacia completed the removal of PCBs in soil, as required, and conducted groundwater monitoring to "ensure that its removal activities had not impacted groundwater." Pl. Br. at 13-14. Pharmacia insists that Mr. Zoch proved that once Pharmacia completed its 5-year groundwater monitoring program, "there was no PCB impact to groundwater and . . . [Pharmacia] had complied with the requirements of the post closure groundwater monitoring program." Pl. Br. at 14, *citing* 1/5/07 Tr. A.M. at 41:12-17. Indeed, Pharmacia argues that "[a]lthough NJDEP required Pharmacia to establish a CEA at the site for benzene, Mr. Zoch testified that the remediation was complete because the CEA did not require further monitoring, and because NJDEP had authorized Pharmacia to remove its monitoring wells." Pl. Br. at 14.

ii. Pharmacia's claim that defendant's lack-of-notice defense is unavailing.

Pharmacia rejects Motor Carrier's defense that it is relieved of any liability for clean-up costs on the grounds that it did not receive adequate notice, under the Agreement, of the NJDEP's and USEPA's actions with respect to the Kearny Site. Indeed, Pharmacia claims that Motor Carrier has the burden of proving (a) that Pharmacia failed to notify Motor Carrier and (b) that Motor Carrier suffered prejudice because of the lack of notice. Pharmacia contends that Motor Carrier has failed to meet its burden on both counts. Pl. Br. at 15.

16

First, Pharmacia argues that Motor Carrier failed to provide a single witness to testify that Motor Carrier had *not* received adequate notice. *Id*. at 16. Indeed, Gary Rozmus of Eder Associates testified that he was not part of the team who reviewed Motor Carrier's files in 1997, and thus could not "testify as to what documents were actually present in Motor Carrier's possession." *Id.*; 1/9/07 A.M. Tr. at 125:1-3, 126:14-16. Moreover, Mr. Rozmus allegedly testified that Eder "only copied a subset of the documents in Motor Carrier's possession, and that it generally copied documents that contained information about conditions at the site – such as Pharmacia's 1995 Responses to [US]EPA." Pl. Br. at 16, *citing* 1/9/07 P.M. Tr. at 66:6-19. Pharmacia claims that Motor Carrier cannot therefore rule out the possibility that the documents Pharmacia produced contained adequate notice. On the contrary, Pharmacia insists that the testimony it presented at trial establishes that Eder received Pharmacia's December 29, 1995 Requests for Information and its February 3, 1995 response to USEPA's Requests for Information, during the course of its due diligence efforts, and that "Motor Carrier has never claimed that it received these responses from a source other than Pharmacia." *Id.* at 16. Pharmacia also claims that the evidence offered at trial confirmed that it had complied with Article 9 of the Agreement in 2003 and 2004. Pl. Br. at 14. Indeed, Pharmacia argues that the parties stipulated to the following:

- The NJDEP issued the Directive to Pharmacia and Motor Carrier, and both received it on or about September 19, 2003. *Id.*

- Counsel for Motor Carrier had notice of the September 2003 General Notice Letter by November 7, 2003 at the latest and "was discussing joint defense arrangements to the notice letter with counsel for Pharmacia." *Id.*

- The USEPA order was issued to Pharmacia on March 10, 2004. *Id.*

17

- Pharmacia "notified Motor Carrier of the [US]EPA Order and the Directive and demanded indemnification on March 19, 2004." *Id.* at 15.

Second, Pharmacia insists that both New Jersey case law and Section 9.12 of the Agreement require Motor Carrier to show prejudice suffered as a result of the alleged late notice, and that Motor Carrier has failed to meet its burden of showing such prejudice. Pl. Br. at 17. Indeed, Pharmacia contends that "Motor Carrier provided no evidence whatsoever that could demonstrate that it "irretrievably lost any substantial rights as a result of the alleged lack of notice", and adds that "Motor Carrier has . . . provided no evidence that it had a likelihood of success in defending Pharmacia before [US]EPA in 1996." *Id.* Pharmacia also argues that "any prejudice to Intermodal is . . . irrelevant [as] during the relevant time period it did not yet own a controlling interest in Motor Carrier and was thus not in a position to react to such notice." *Id.* at 19.

Pharmacia rejects Intermodal's argument that it "would not have purchased Motor Carrier's stock had it known of the April 1996 General Notice Letter or that Motor Carrier was responsible for actions relating to the Passaic River". First, Pharmacia contends that the testimony offered at trial established clearly that Intermodal and its consultants knew of the USEPA Requests for Information, and believed that they did not raise any red flags. Pl. Br. at 19, *citing* 1/9/07 Tr. A.M. 12:12, 91-25-92:1. Second, Pharmacia submits that the evidence shown at trial establishes that Intermodal and its consultants "conducted no follow-up inquiry with [US]EPA after learning of [US]EPA's Requests and Pharmacia's responses," "did not follow ASTM industry standards for due diligence in property transactions by failing to search [US]EPA's records", and "failed to retain all of Motor Carrier's records." Pl. Br. at 19,

*citing* 1/9/07 P.M. Tr. at 9-10, 66:6-9.

Similarly, Pharmacia disputes the contention that Intermodal's reliance on the "estoppel letter" from Pharmacia establishes that Pharmacia "either concealed the presence of the [US]EPA's Notice Letter from CSX Intermodal, or proves that Pharmacia did not believe that Motor Carrier's responsibilities extended to the [US]EPA investigation at that time." Pharmacia claims instead that the letter "simply states that Pharmacia does not claim as of this date that Motor Carrier is in default of under the Kearny Site Agreement, or the mortgage, and that Pharmacia had not served Motor Carrier with a Violation Notice as a predicate to exercising its right of re-entry pursuant to Section 1.5(b) of the Kearny Site Agreement. Pl. Br. at 20, 1/8/07 A.M. Tr. 101:15-17. By contrast, Pharmacia argues, the opinion letter of Motor Carrier's counsel establishes that Motor Carrier had knowledge of the USEPA's investigation at the time of the letter. Pl. Br. at 20, and the Stock Purchase Agreement proves that the Motor Carrier stockholders had knowledge of USEPA's Requests for Information. Pl. Br. at 21, *quoting* Ex. J-18.

Pharmacia also contests Intermodal's suggestion that "it was prejudiced because it could have acquired other properties in lieu of the former Monsanto Site in 1998 had it know of the [US]EPA's Notice Letter . . . ." Pl. Br. at 21. Indeed, Pharmacia submits that the Court was shown evidence that the "so-called alternatives were [not] as attractive as the Kearny Site." *Id.*, *citing* Ex. P-182, 1/9/07 A.M. Tr. at 65:4-14, 65:24-66:14, 65:12-14, 66:9-14.

Finally, Pharmacia claims that "Defendants' notice defense . . . fails because the [US]EPA Order and Directive are different actions than those conducted by [US]EPA in 1995 and 1996," and because the 1996 General Notice Letter does not address the claim at issue. Pl.

19

Br. at 22. In particular, Pharmacia argues that "[t]he April 1996 General Notice Letter 'invited' Pharmacia to participate in a remedial investigation of a six-mile stretch of the Passaic River that was being conducted by Occidental Chemical Corporation . . . In comparison, the September 2003 General Notice Letter and the [US]EPA Order . . . concerns 'the entire stretch of the Lower Passaic River and its tributaries . . . .'" *Id*. at 22-23.

> iii.   Pharmacia's claim that Defendants are liable to Pharmacia for contribution under CERCLA.

Pharmacia argues that the evidence introduced at trial establishes that the USEPA Order and its Amendments constitute an administrative settlement pursuant to CERCLA Section 122, that by signing Amendment 1 on June 29, 2005, Pharmacia became a "settling party" to the USEPA Order, and that Pharmacia thus "settled its liability for a portion of USEPA's response costs associated with the RI/FS of the Lower Passaic River." Pl. Br. at 24-25.

Pharmacia submits that the evidence it produced at trial established that: (i) Motor Carrier and Intermodal are "covered persons" under CERCLA, (ii) that Pharmacia "is the current owner or past owner of a facility . . . from which there has been a release of hazardous substances into the Lower Passaic River", (iii) that "Pharmacia has incurred 'response costs' as a result of the alleged release or threatened release from the former Monsanto faility to the Lower Passaic River," and (iv) that "Pharmacia's response costs . . . are consistent with the National Contingency Plan and thus recoverable under the statue." *Id*. at 25-26. Pharmacia concludes that Motor Carrier has therefore been shown to be liable to Pharmacia for contribution under CERCLA.

     iv. Pharmacia's claim that Motor Carrier is liable for contribution under the Spill Act.

  Similarly, Pharmacia argues that the testimony offered at trial establishes that "Pharmacia is entitled to contribution from Defendants under the Spill Act because Pharmacia has incurred and will incur costs of cleanup relating to discharges alleged by NJDEP for which Motor Carrier and [Intermodal] are persons 'in any way responsible.'" Pl. Br. at 27.  Indeed, Pharmacia claims that the evidence showed that Motor Carrier and Intermodal are the current owners of the Kearny Site, and that they are therefore jointly and severally liable for the costs of cleanup.  *Id*. at 27-28.

  Pharmacia adds that the evidence proves that Defendants are also liable "for any continuing discharges from the Kearny Site to the Passaic River."  *Id*. at 28.  Indeed, John Sacco, the NJDEP official responsible for enforcing the Directive, testified at trial that "NJDEP considered both historic discharges as well as new pathways when assigning responsibility under the Spill Act."  *Id*.  Pharmacia concludes that since "[i]n a Spill Act contribution action the Court allocates the cleanup and removal costs amongst the parties evaluating such equitable factors as the court determines are appropriate," and since "courts consider private indemnification agreements as such equitable factors," "Defendants' equitable share is not zero but 100% of Pharmacia's costs."  *Id.* at 29.

    **2.** **Motor Carrier's Claims**

  Motor Carrier, on the other hand, contends that Pharmacia (i) breached the notice provisions of the Agreement, (ii) failed to establish that the Motor Carrier should be responsible for clean-up costs incurred after the Effective Time of the Agreement, (iii) is estopped from enforcing the Agreement, and (iv) has failed to establish its CERCLA and Spill Act claims.

        i.     Defendants' claim that Pharmacia breached the notice and cooperation provisions of the Agreement.

As a threshold matter, Defendants argue that "Pharmacia cannot prevail on its contract claim or either of its statutory causes of action because it failed to . . . establish that it complied with all material requirements of that contract." Def. Br. at 2. In particular, Defendants claim that Sections 9.8, 9.9, 9.10, 9.12 and 13.1 of the Agreement set out Pharmacia's notice and cooperation obligations, with which it failed to comply. Def. Br. at 3-4. Defendants claim that the parties have stipulated that there were a number of written communications between 1995 and 2004 between Pharmacia and USEPA. *Id.* at 4-5. Defendants further claim that Jeffrey Klieve's testimony showed that the "April 26, 1999 letter from USEPA was a 'substantive contact,'" and that Motor Carrier was not given an opportunity to defendant or settle USEPA's claims. *Id.* at 5, *citing* 1/4/07 P.M. Tr. at 39:15-23. Moreover, Defendants note that Kathleen Moldthan, a professional geologist, testified that USEPA's requests for information were communications from the government," yet did not recall providing information to Motor Carrier when responding to USEPA. *Id.* at 5-6.

Defendants conclude that since Pharmacia has breached the notification requirement in the Agreement, all of its claims based on the Agreement must fail. *Id.* at 7.

        ii.    Defendants' claim that Pharmacia failed to prove that any clean-up is due to hazardous substances which migrated from the Site after December 19, 1994.

Defendants argue that Pharmacia's contract claim is based primarily on Section 2.3 of the Agreement. Def. Br. at 7-8, *citing* 1/5/07 P.M. Tr. at 5:12-25 and 37:17-39:24. Defendants note that Section 2.3 relates to "Substances present at or which migrate from the Kearny Site, the Plant or the Property at any time *after* the Effective Time . . . ." Def. Br. at 8, *quoting*

Agreement, Ex. J-5 at § 2.3 (emphasis added).   Defendants insist, however, that "[a]ll pertinent

witnesses testified that they knew of no post-1994 discharges," and that the record is replete with

documents establishing that there were no discharges after the Effective Time of the Agreement.

Def. Br. at 9-10. Indeed, Defendants argue that the January 1999 and February 2000 reports that

were submitted to the NJDEP as part of the groundwater monitoring program "failed to detect

any contaminants leaving the Kearny Site." *Id.*

By contrast, they argue, Plaintiff's "only purported evidence of post-1994 discharge

consisted of conjecture contained in a[n] . . . internal memo prepared by Pharmacia's

environmental consultant Patricia Burns," based on "worst-case scenario" assumptions and "non-

representative" data.  Def. Br. at 10.  Defendants conclude that "[t]he calculations and

assumptions in [the internal memo] simply do not overcome the overwhelming testimony and

documentary evidence that there were no discharges after December 1994."  *Id.* at 11.

> iii.   Defendants' claim that Pharmacia is estopped from enforcing the
>        Agreement.

Defendants argue that the evidence put forth at trial establishes that Pharmacia is not

entitled to enforce the Agreement under the doctrine of equitable estoppel.  Indeed, Defendants

claim that Pharmacia's "conduct and misrepresentation" – i.e., Pharmacia's alleged failure to

inform Motor Carrier of its "numerous communications concerning its potential liability for

conditions in the Passaic River" – constituted a breach of the Agreement.  *Id*. at 12.  Defendants

add that the Agreement was breached not only by Pharmacia's omissions, but also by its

misrepresentations in the estoppel certification issued by Pharmacia to Intermodal on January 7,

1998. *Id*. at 13.

Defendants contend that the trial testimony proved that Pharmacia's silence and

23

misrepresentation were intended to induce reliance. Defendants argue in particular that

Pharmacia's affiliate responded to Motor Carrier's request for an estoppel certificate, and

"admitted that Monsanto's estoppel certificate was intended to induce reliance . . . ." *Id*. at 13.

Moreover, Defendants claim that the testimony of Charles McSwain establishes that Intermodal

relied "both Pharmacia's inaction between 1995 and 1998 in failing to present a claim

concerning the Passaic River and Monsanto's estoppel certificate." *Id*. at 14.

    Finally, Defendants submit that the evidence proves that Defendants changed their

position, *to their detriment*, in reliance on Pharmacia's conduct. Indeed, Defendants highlight the

testimony of Mr. McSwain, who explained that Intermodal were also interested in acquiring one

of four or five other parcels that could meet their needs. In essence, Defendants argue that

"Intermodal had options but changed its position by electing to buy Motor Carrier." *Id*. at 15.[1]

             iv.    Defendants' claim that Pharmacia has failed to establish its
                     contribution claim under CERCLA at trial.

    Defendants argue that "Pharmacia relied upon its 2004 voluntary settlement with USEPA

as the exclusive basis for its CERCLA contribution claim." *Id*. at 18.  Defendants contend,

however, that the evidence provided at trial establishes that Pharmacia's settlement with USEPA

---

[1]    Defendants also denounce Pharmacia's efforts to "avoid the application of
estoppel . . . by attempting to distinguish between a six (6) mile portion of the
lower Passaic River and a seventeen (17) mile stretch of the river which includes
the six (6) mile portion." Def. Br. at 16.  Defendants argue that the evidence
introduced at trial, including the testimony of Jeffrey Klieve, establishes that
USEPA's September 14, 2003 and April 26, 1996 letters contained "similar
requests." *Id*.  Defendants conclude that "Pharmacia's contention – that there are
two separate and distinct matters involving the lower Passaic River – is
completely contrary to the language of the relevant documents . . . and is simply
illogical." *Id*. at 17.

only "concerns the Lower Passaic River Study Area, a 17-mile stretch of the Passaic River and its tributaries . . .", not the Kearny Site.  *Id*. at 18-19. Defendants submit that Pharmacia's admission that "it discharged hazardous substances from the Kearny Site to the Lower Passaic River [prior to 1994], does not make these two places part of the same CERCLA facility."  *Id.* at 19. Defendants conclude that "Pharmacia simply failed to make out a contribution claim based on its settlement with USEPA against any of the Defendants pursuant to CERCLA Section 113.(f)(3)(b)."  *Id*. at 21.

> v.    Defendants' claim that Pharmacia has failed to establish its contribution claim under the Spill Act.

Defendants argue that the evidence provided at trial established three separate grounds on which Pharmacia's Spill Act claim should be rejected.  *Id*.  First, Defendants claim that the evidence proved that no discharge to the Kearny Site, or from the Kearny Site to the Passaic River, had occurred since the Effective Time of the Agreement.  *Id*.

Second, Defendants submit that "Pharmacia failed to [establish] that it has paid more than its fair share of cleanup and removal costs."  *Id.*, *citing Village of Ridgewood v. Shell Oil Co.*, 289 N.J. Super. 181, 191 (N.J. Super. Ct. App. Div. 1996).  Indeed, Defendants contend that "[t]he only evidence introduced by Plaintiff related to costs paid, without regard to how much, in fairness and equity, Pharmacia *should* pay." Def. Br. at 22 (emphasis in original).  Defendants specifically point to the testimony of Mr. Klieve, who allegedly testified "that he was not aware of any costs incurred by Pharmacia due to hazardous substances discharged by Motor Carrier." *Id.*, *citing* 1/4/07 P.M. Tr. at 74:5-9.  Defendants conclude that "[i]n the absence of any evidence linking the Defendants to any contamination . . . none of the Defendants can fairly be required to

pay any of Pharmacia's costs pursuant to the Spill Act."  Def. Br. at 23.

Third, Defendants argue that "to the extent that any of the Defendants could properly be viewed as 'purchasers' [under the Spill Act] . . . they are 'innocent [purchasers]' and do not face Spill Act liability for Pharmacia's contribution claims."  Id. at 24.

### C.    ANALYSIS

1.    Did Pharmacia Breach the Contract by Failing to Provide Notice?

Under Section 9.12 of the Agreement,

> [n]either party shall take any action or make any communication which could reasonably be expected to have a materially adverse effect on the resolution or outcome of any matter for which the other party may be liable under Article 2 or Section 9.6 without providing at least five (5) business days advance notice to the other party.  Any material breach of this obligation shall relieve the party to whom such notice was not provided of liabilities and indemnification under Article 2 or Section 9.6 with respect to such matter to the extent that such non-notified party has been prejudiced by the lack of timely and adequate notice.

Agreement, Ex. J-5 at § 9.12. Moreover, under Section 9.8(b) of the Agreement:

> each party will inform the other party of all substantive contacts between Governmental Agencies and itself relating to the Property which could reasonably be expected to have an adverse impact on the other party.

Id. at § 9.8(b).

Having reviewed all the testimony offered at trial and the parties's post-trial submissions, the Court finds that Motor Carrier has failed to meet its burden of showing that it suffered prejudice as a result of Pharmacia's alleged failure to meet its notification obligations under the Agreement.  While Motor Carrier takes Pharmacia to task for its conduct in settling the matter with the authorities at an early stage, it fails to offer any evidence of how it would have handled

26

the negotiations had it been involved. *See* Def. Br. at 7 ("Pharmacia, without notice to, or

permission from, Motor Carrier, voluntarily waived what it had previously viewed as a complete

defense, settled with USEPA and simply presented the bill to Motor Carrier.").[2]  As Pharmacia

correctly points out, "[i]n this matter, Defendants have failed to point out *any* strategy decisions

made by Pharmacia that were 'questionable,' or in any way detrimental to [Motor Carrier]."  Pl.

Br. at 18.

      For the foregoing reason, this Court finds that substantial evidence at trial showed that

Motor Carrier did not suffer any prejudice as a result of any lack of notice, and that the notice

provisions of the Agreement were not therefore breached by Motor Carrier.[3]  The Court need not

address whether CSX or Intermodal were prejudiced by a lack of notice.  Neither of these parties

had an interest in Motor Carrier during the relevant time period – accordingly, they had no rights

under the Agreement.

      2.      To Whom Does the Agreement Allocate Liability?

      Having reviewed all the parties' submissions, and having witnessed the testimony offered

at trial  the Court finds that Motor Carrier is liable, under the Agreement, for the clean-up costs

incurred by Pharmacia.

---

[2]      While Mr. Klieve testified that there may have been a complete defense available
to Pharmacia, neither Motor Carrier nor the witness were able to identify what
defense that may have been.  Def. Br. at 7.

[3]      In the alternative, the Court finds that the testimony offered at trial (and in
particular, the evidence outlined *supra* at 16) establishes that Motor Carrier
received adequate notice under the Agreement of NJDEP's and USEPA's actions
with respect to the Kearny Site.

"When interpreting a contract, our goal is to ascertain the intention of the parties to the contract as revealed by the language used, taken as an entirety . . . the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain.'" *Cruz-Mendez v. Isu/Insurance Servs.*, 156 N.J. 556, 522 (1999), *quoting Onderdonk v. Presbyterian Homes*, 85 N.J. 171, 184 (1981). The Court notes, however, that "[i]n interpreting a contract, [i]t is not the real intent but the intent expressed or apparent in the writing that controls." *Leodori v. Cigna Corp.*, 175 N.J. 293, 300 (2003), *quoting Garfinkel v. Morristown Obstetrics & Gyn. Assocs.*, 168 N.J. 124, 135 (2001), *see also Friedman v. Tappan Dev. Corp.* 22 N.J. 523, 531 (1956). The Court will analyze each of the relevant sections of the Agreement in turn.

a.      Section 2.2 of the Agreement

Section 2.2 provides in relevant part:

> Monsanto is currently performing remedial action at the Plant under an approved remedial action work plan ("Work Plan") pursuant to an administrative consent order ("ACO") agreed upon with the [NJDEP] . . . Monsanto intends to complete prior to Closing such remedial action at the Plant as provided in the current Work Plan . . . except for the groundwater sampling which is expected to be continued by Monsanto beyond the Closing. After the Closing, Monsanto will continue groundwater sampling as required by the NJDEP under such Work Plan.  If Monsanto elects to require Closing prior to receipt of the NFA Letter . . . and the NJDEP after Closing conditions issuance of the NFA Letter upon and modifies the current Work Plan and ACO to mandate additional remediation . . . with respect to soil or soil media for Substances known or shown to be present  prior to Closing for which Monsanto (and not Motor Carrier or its affiliates) is responsible, Monsanto will perform such required remedial action or take other action with respect to such Substances in soil or soil media for which Monstanto is responsible to the extent necessary to furnish such NFA letter . . . .  If the NJDEP modifies the current Work Plan and/or ACO and mandates additional remedial action or other action as a direct result of information provided to the

> NJDEP by Monsanto . . . Monsanto will perform such required
> remedial action at the Plant . . .
>
> If Motor Carrier after the Effective Time is required to treat,
> remove, and/or dispose of an Unknown ISRA/Spill Act Hazardous
> Material or PCB's as part of a Government Mandated ISRA/Spill
> Act Clean-up, Monsanto will pay the Incremental Cost of such
> treatment, removal and/or disposal . . . .

Agreement, Ex. J-5 at § 2.2.  Since it is undisputed that Pharmacia completed its work under the

ACO, that the Work Plan was not modified, and that Pharmacia received an NFA letter from the

NJDEP, the Court finds that Pharmacia has met any and all obligations it had under Section 2.2.

This Section of the Agreement cannot be interpreted to assign to Pharmacia liability for costs

arising out of the clean-up at issue in this matter.

        b.       Section 2.3 of the Agreement

Section 2.3 of the Agreement provides, in relevant part, that:

> [e]xcept as otherwise provided in Section 2.2 of this Agreement,
> Purchaser and its respective successors in title or interest and
> assigns shall bear and be liable for: (i) any and all costs and
> expenses (including attorney's fees) of Clean-up (including but not
> limited to any Clean-up or costs arising therefrom under federal
> law, including but not limited to, any Clean-up under CERCLA . . .
> and any Clean-up under the laws of the State of New Jersey,
> including but not limited to ISRA, the Spill Act or other acts or
> regulations promulgated by the State of New Jersey) (ii) and any
> voluntarily incurred costs and expenses (including attorney's fees)
> to investigate, remediate, remove, treat, clean up or prevent the
> escape, in each case of any Substances present at or which migrate
> from the Kearny Site, the Plant or the Property at any time after the
> Effective Time, including but not limited to Substances, PCB's
> and/or Unknown ISRA/Spill Act Hazardous Material . . . .

Agreement, Ex. J-5 at § 2.3.  There seems to be little dispute, based on the parties' post-trial

submissions and the evidence submitted at trial, that Motor Carrier assumed some responsibility

for clean-up costs under Section 2.3.  The only ambiguity in the language of the provision

remains the time limitation "any time after the Effective Time".

The Court finds that the phrase "any time after the Effective Time" modifies the

proposition "any and all voluntarily incurred costs . . . to remediate . . . any Substances . . . .",

rather than the proposition "Substances . . . which migrate from the Kearny Site . . . ."  In

essence, the Court finds that Section 2.3 should be read to allocate to Motor Carrier liability for

voluntary costs incurred in remediating the Site and/or the River after the Effective Time, and

should not be interpreted to limit Motor Carrier's liability for remediation of damage done to the

property after the Effective Time.  This interpretation of the Agreement is buttressed by the fact

that Sections 2.2, 2.4 nor 2.5 – all of which address the issue of liability for environmental clean-

up – do not reference any restriction of Motor Carrier's liability to damage inflicted after the

Effective Time.

In construing a contract, "[t]he document must be read as a whole, in 'accord with justice

and common sense.'"  *Cumberland County Imp. Auth. v. GSP Recycling Co., Inc.*, 818 A.2d 431,

438 (N.J. Super. Ct. App. Div. 2003), *cert. denied*, 177 N.J. 222 (June 5, 2003), *quoting*

*Krosnowski v. Krosnowski and Garford Trucking, Inc.*, 22 N.J. 376, 387 (1956).  The Agreement

"should not be interpreted to render one of its terms meaningless. 'Literalism must give way to

context.'"  *Cumberland*, at 438, *quoting Borough of Princeton v. Bd. of Chosen Freeholders of*

*County of Mercer*, 333 N.J. Super. 310, 325 (N.J. Super. Ct. App. Div. 2000), *aff'd*, 169 N.J. 135

(July 23, 2001).

Accordingly, the Court rejects, on the basis of the evidence produced at trial and the

parties' submissions, Motor Carrier's interpretation of Section 2.3.  The Court finds that

substantial evidence supports its finding that Motor Carrier assumed liability under Section 2.3

for the clean-up costs at issue in this case.

c.      Section 2.4 of the Agreement

Under Section 2.4 of the Agreement:

> [Pharmacia] will be liable for and will indemnify . . . Motor Carrier
> and its Affiliates . . . from and against: . . . (b) the costs of the
> Clean-up required to obtain the NFA Letter or subsequently
> required under ISRA by amendment to the current Work Plan and
> ACO for groundwater described in and limited by Section 2.2 of
> this Agreement as required pursuant to ISRA (but expressly
> excluding any liability for Incremental Cost for PCB's, and/or
> Unknown ISRA/Spill Act Hazardous Material under a Government
> Mandated ISRA/Spill Act Clean-up under Section 2.2 of the
> Agreement, which liability is subject to reimbursement only as
> limited by the terms and conditions in Section 2.2) . . . .

Agreement, Ex. J-5 at § 2.4.

Once again, the testimony offered at trial established that the costs sought in this case

were not costs of clean-up "to obtain the NFA Letter or subsequently required . . . by amendment

to the current Workplan and ACO."  Indeed, it is undisputed that Pharmacia received an NFA

letter prior to incurring the costs at issue here, and that the costs incurred were not required by

any Amended Work Plan (as the Work Plan was never amended by NJDEP and Pharmacia).

Accordingly, the Court finds that the evidence produced at trial establishes that Section 2.4 does

not compel the conclusion that Pharmacia should be liable for the cost of clean-up.

d.      Section 2.5 of the Agreement

The Court's interpretation of Section 2.4 is buttressed by the language of Section 2.5 of

the Agreement, which states:

> Purchaser . . . will be liable for and will indemnify, save and hold

> harmless [Pharmacia] . . . from and against: . . . (b) any costs of
> Clean-up of Substances, including but not limited to, any Clean-up
> under federal law . . . or any clean-up under the laws of the State of
> New Jersey . . . for all substances . . . and whether or not such
> Clean-up arises from or in connection with Substances dumped,
> buried, injected, deposited or disposed of by [Pharmacia] . . .
> (except to the extent covered under Section 2.2 of this Agreement
> as it pertains to the NFA Letter and performance of remedial or
> other action with respect to groundwater mandated by the current
> Work Plan and ACO or an amendment thereto) . . . .

Agreement, Ex. J-5 at § 2.5.  Again, since this Court has found that the reimbursements sought

by Pharmacia in this matter do not relate to actions performed in seeking an NFA Letter, nor to

the Work Plan or its Amendments, the language of Section 2.5 confirms that Motor Carrier is

liable under the Agreement for the costs of clean-up under the Agreement.

e.      Equitable Estoppel

Motor Carrier did not devote much of its post-trial submissions to contesting its liability

under the language of the Agreement. Instead, Motor Carrier focused primarily on the argument

that the doctrine of equitable estoppel precludes Pharmacia from enforcing the Agreement.

As the New Jersey Supreme Court has explained, "[that] doctrine is designed to prevent

injustice by not permitting a party to repudiate a course of action on which another party has

relied to his detriment."  *Knorr v. Smeal*, 178 N.J. 169, 178 (2003), *citing Mattia v. Northern Ins.*

*Co. of New York*, 35 N.J. Super. 503, 510 (N.J. Super. Ct. App. Div. 1955).  "The doctrine is

invoked in 'the interests of justice, morality and common fairness.'" *Knorr*, at 178, *quoting*

*Palatine I v. Planning Bd.*, 133 N.J. 546, 560 (1993).  "In short, to establish equitable estoppel,

plaintiffs must show that defendant engaged in conduct, either intentionally or under

circumstances that induced reliance, and that plaintiffs acted or changed their position to their

32

detriment." *Knorr*, at 178, *citing Miller v. Miller*, 97 N.J. 154, 163 (1984).  Such reliance must, however, be reasonable.  *See Talcott Fromkin Freehold Assocs. v. Freehold Tp.*, 383 N.J. Super. 298, 315 (N.J. Super. Ct. Law Div. 2005) ("Estoppel is conduct, either expressed or implied, which *reasonably* misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law.") (emphasis added).

The Court is not convinced, on the basis of the evidence offered at trial, that Motor Carrier's alleged reliance on Pharmacia's actions was reasonable for the purposes of estoppel. Indeed, it is undisputed that the following documents were provided to Motor Carrier prior to the date of execution of the Agreement:

- The Roux Associates Feasibility Study, which described the "impact to ground water" as "limited, " but noted that among the objectives of the remedial action were the "Cleanup [of] pollution at the site, emanating from the site, or which has emanated from the site," and achieving and maintaining ground-water quality standards.  Ex. P-105 at 31. The Study also noted that the long-term ground-water monitoring it recommended "would adequately track off-site migration of impacted ground water."  *Id.* at 33.

- The NJDEP ACO, which revealed that the migration of pollutants may be a concern, and that pollutants may at a later time be found to have emanated from the Site.

- A June 12, 1992 letter to Pharmacia from Roux which contained "information regarding potential discharge to the Passaic River of ground-water constituents from the upper and lower water-bearing zones at the Monsanto Kearny Plant . . . ."  Ex. P-80, at 1. While the document deemed the risk that the NJDEP would find the contamination of the Passaic River by the Kearny Site to be "extremely unlikely," it stopped short of ruling it out.

In light of these documents, among others, raising the prospect of possible seepage of polluting substances off the Kearny Site, and in light of the clear language of the Agreement assigning responsibility for the clean-up of such environmental damage to the purchaser of the

Kearny Site, the Court holds that Motor Carrier could not have reasonably relied on the estoppel

letter – even if that letter had been intended to mislead Motor Carrier – in purchasing the

property on the assumption that it would not be responsible for costs of environmental clean-up.

Moreover, even if such reliance had been reasonable, significant evidence was offered at

trial to suggest – as was explained earlier in this opinion – that Motor Carrier suffered no

detriment in purchasing the property in reliance on Plaintiff's alleged misrepresentations as none

of the alternative properties contemplated for purchase were suitable.[4]

       3.     Does Pharmacia have the right to reenter the Kearny Site and terminate the Agreement?

Section 1.5(b) of the Agreement provides as follows:

> (b) Without limiting the availability of any other remedies under
> the terms of the Deed, the Deed will reserve to [Pharmacia] . . . the
> right . . . to reenter and terminate the estate granted to Motor
> Carrier (or any successor in title or interest to Motor Carrier),
> without obligation to reimburse Motor Carrier (or any such
> successor) for any improvements made, upon the occurrence of . . .
> the following event[]: . . . (ii) any breach of any of the conditions
> and obligations of Motor Carrier, its Affiliates, its successors in
> title or interest in the Deed or this Agreement . . . .

Agreement, Ex. J-5 at § 1.5(b).

This Court has held that Defendants failed to reimburse Pharmacia for the costs of clean-

up it seeks in this action, and that such a refusal constituted a breach of the Agreement.

Accordingly, the Court finds that if Pharmacia complies with the conditions set out in Section

---

[4]    It is the Court's view that Pharmacia and Motor Carrier properly assigned
responsibility for the clean-up costs under the Agreement as a matter of contract
law.  The Court need not, therefore, address Pharmacia's right to contribution
under CERCLA and the Spill Act.

1.5(b)(ii)(aa)-(dd) of the Agreement, it may terminate Motor Carrier's estate and reenter the

Kearny Site.

       4.     May CSX be held responsible for Intermodal's liabilities?

     This Court has already held at the summary judgment stage that Intermodal should be

held responsible for the liabilities of Motor Carrier.  Pharmacia seeks to have the Court now find

that CSX is responsible as an Assurance Affiliate under the Agreement for Intermodal's liability.

Section 2.1 of the Agreement defines the term "Affiliate" as follows:

> "Affiliate" of a specified party means any other present or future
> person (including individuals, corporations and other legal entities)
> directly or indirectly controlling or controlled by or under direct or
> indirect common control with, such specified party. For purposes
> of this definition, "control" when used with respect to a specified
> person or party means the management and policies of such person
> or party directly or indirectly, whether by ownership of voting
> securities, by contract or otherwise; and the terms "controlling"
> and "controlled" have meanings correlative to the foregoing.

Agreement, Ex. J-5 at § 2.1(a).  Section 13.19 of the Agreement, in turn, describes an Affiliate's

responsibilities as follows:

> [i]f at the end of any calendar quarter the [net worth of Motor
> Carrier] shall be less than Five Million Dollars . . . [Motor Carrier]
> shall promptly notify [Pharmacia] and, within fifteen (15) days and
> from time to time thereafter until [Pharmacia] has been provided
> with financial assurance . . . , shall cause Affiliates to become
> Assurance Affiliates by causing them . . . to become parties to this
> Agreement, to guaranty and/or to otherwise become liable for the
> obligations under the Agreement . . . to the same extent as [Motor
> Carrier] . . .

*Id.* at § 13.19.

     It is undisputed that Intermodal has at all relevant times been a wholly-owned subsidiary

of CSX, who in turn owns all of the shares of Motor Carrier.  It is also undisputed that Motor

35

Carrier's net worth was valued by Deloitte & Touche in October 1997 at approximately $340,000.

Accordingly, the Court finds that CSX has become an Assurance Affiliate of Motor Carrier under the Agreement and has therefore "become liable for the obligations under the Agreement . . . to the same extent as" Motor Carrier and Intermodal. *See* Agreement, Ex. J-5 at § 13.19.

## III.    CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motion for Reconsideration and Motion to Dismiss, and will deny Plaintiff's Motion in Limine to Preclude the Testimony of David Bowling.

On the basis of the evidence introduced at trial, the Court also finds that Motor Carrier, CSX and Intermodal shall indemnify Pharmacia pursuant to the Agreement for any and all costs for which Pharmacia is or becomes liable to NJDEP and USEPA pursuant to the NJDEP Directive, the USEPA Order as amended by Amendment No. 1, or any future action by NJDEP, USEPA or any other regulatory agency related to the remediation of the Lower Passaic River, and for future cleanup of the Kearny Site.  The Court also finds that Motor Carrier has breached the Agreement, and that Pharmacia therefore has the right to reenter and terminate the estate granted to Motor Carrier. An appropriate form of Order accompanies this Opinion.

Dated: June 20, 2007

　　　　　__   s/ Garrett E. Brown, Jr._____
　　　　　GARRETT E. BROWN, JR., U.S.D.J.